RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

KEITH LAMAR,

　　　　*Petitioner-Appellant/Cross-Appellee,*

　　*v.*

MARC C. HOUK, Warden,

　　　　*Respondent-Appellee/Cross-Appellant.*

Nos. 11-3131/3153

―――――――――――

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00541—Thomas M. Rose, District Judge.

Argued: December 2, 2014

Decided and Filed: August 18, 2015

Before: CLAY, ROGERS, and KETHLEDGE, Circuit Judges.

―――――――――――

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant/Cross-Appellee. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, Kathleen McGarry, MCGARRY LAW OFFICE, Glorieta, New Mexico, for Appellant/Cross-Appellee. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee/Cross-Appellant. James L. Hardiman, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, INC., Cleveland, Ohio, Staughton Lynd, AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, INC., Niles, Ohio, for Amicus Curiae.

1

---

**OPINION**

---

ROGERS, Circuit Judge.    Keith LaMar appeals a district court judgment denying his habeas corpus petition.  LaMar was convicted of murdering five fellow inmates during a prison riot in Ohio; he received death sentences for four of the killings and a life sentence for the fifth. On appeal, LaMar argues that the State withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  He also argues that the state trial court denied him due process by refusing to sever one count from the remaining charges, that there was insufficient evidence for one of the capital sentencing aggravators, and that he was denied due process by prosecutorial misconduct during his trial.  The Warden, Marc Houk, cross-appeals, arguing that LaMar's petition was time-barred.  The district court properly denied habeas relief.

**I.**

The facts leading to LaMar's convictions were summarized by the Ohio Supreme Court as follows:

> On the afternoon of April 11, 1993, a group of Muslim inmates seized control of cellblock "L" ("L–Block") at SOCF [, the Southern Ohio Correctional Facility]. The rioting inmates took several guards hostage and locked inmates considered "snitches" into various cells in the L–6 section of L–Block.  The Muslim inmates maintained control of unit L–6 while two other dominant groups—the Aryan Brotherhood (a racist group of white inmates) and the Black Gangster Disciples (a prison gang)—controlled other units within L–Block.
>
> On the day of the riot, LaMar was an SOCF inmate serving a sentence of eighteen years to life for a 1989 murder conviction.  LaMar, who was not a Muslim, did not plan or participate in the prison takeover and was in the prison recreation yard when the riot began.  But after the commotion began, LaMar and two other inmates, Louis Jones and Derek Cannon, went back inside L–Block to check the personal belongings in their respective cells.  When the three were unable to get back outside because the Muslims had closed access to and from L–Block, LaMar said to Jones and Cannon, "Ain't no need in us staying in here getting caught up in something we're not a part of.  Let's kill all the snitches and get out to the yard."
>
> LaMar approached Cecil Allen, a leader of the Muslim group of inmates, and asked, "if we kill the snitches, could we be let out to the yard so we don't be a

part of this?" Allen consulted with the Muslim leadership and returned a few minutes later to tell LaMar that the "orders has [sic] been granted to kill the snitches."

After Allen granted permission to "kill the snitches," LaMar, Jones, and Cannon walked around the L–Block corridor to enlist other inmates to help them. Eventually, the group recruited Hiawatha Frezzell (a.k.a. "Pittsburgh"), Eric Scales (a.k.a. "Tiger"), Derrick Mathews, Rasheem Matthews, Albert Young (a.k.a. "Da–Da"), and Gregory Curry to join the newly formed death squad. LaMar's group proceeded to unit L–2, where they retrieved bats, shovels, and weight bars to use as weapons. The men also wore masks fashioned from T-shirts, towels, and bandannas.

After arming and disguising themselves, LaMar and his group returned to L–6. Inmate Timothy Grinnell was operating the console that controlled the cell doors within L–6. LaMar led his group to the upper tier of the cellblock and instructed Grinnell to open a cell occupied by Andre Stockton. After Grinnell complied with the demand, LaMar and Curry entered the cell and beat Stockton with a shovel and a baseball bat. Other members of the group dragged Stockton from the cell and participated in the beating.

After beating Stockton, the group went downstairs to the lower tier of L–6. LaMar yelled at Grinnell to open the cells occupied by inmates Ellis Walker and Darrell Depina. After Walker refused to comply with LaMar's command to come out of the cell, LaMar and Curry dragged him to the main floor of the cellblock and beat him repeatedly. Other members of the death squad also participated in Walker's beating. LaMar then ordered Depina out of his cell. When Depina refused, LaMar entered the cell and hit him several times before dragging him to the main floor, as he had done with Walker. LaMar continued to beat Depina with a baseball bat, striking him several times. Other members of LaMar's group joined in beating Depina, who died from his injuries.

When LaMar finished beating Depina, he ordered Grinnell to open a cell occupied by Bruce Vitale. When Vitale refused to come out of the cell, LaMar hit him on the head with a shovel. LaMar continued beating Vitale on the head and at one point knocked a tooth out of Vitale's mouth. Vitale tried to defend himself by crawling under the bed, but LaMar and Curry dragged him out of the cell and continued the beating, joined by other members of the death squad. At one point, LaMar told Jones, "I didn't bring you all in here to stand around," when he noticed that Jones was not participating in the assault. Vitale was still alive when the group left him but died after Frezzell and another member of LaMar's group stabbed and beat him again.

LaMar continued on to a nearby cell occupied by Thomas Taylor, another suspected snitch. Before LaMar could order Taylor's cell opened, a Muslim inmate named Harris intervened and told LaMar that Taylor was under Muslim protection. LaMar angrily pushed Harris out of the way, saying, "If he [Taylor] is in there, he's a snitch. Fuck it. Kill him." After Taylor told LaMar that he was

not a snitch, LaMar agreed to spare Taylor's life, but only if Taylor would kill Albert Staiano, who was locked in an adjacent cell. To save his own life, Taylor agreed. LaMar ordered Taylor's and Staiano's cells opened and commanded one of the other inmates to give a baseball bat to Taylor. Staiano tried to run from his cell, but fell to the ground when Frezzell tripped him. Taylor hit Staiano over the head several times with the baseball bat and then, after the bat broke, with a fire extinguisher. Other death-squad members, not including LaMar, joined in the assault and stabbed Staiano repeatedly. When the beating ended, LaMar ordered Taylor to return to his cell. Taylor eventually pleaded guilty to involuntary manslaughter for his role in Staiano's death.

The death squad's next stop was a cell occupied by Michael Trocadero and four to five other inmates. LaMar ordered Grinnell to open the cell, but Grinnell refused, saying that the Muslim leadership did not want those inmates killed. As LaMar and his group began to leave L–6, it passed the cell of William Svette, an elderly inmate who used a walker to move himself around. Svette, who appeared to have been beaten earlier, cursed the death squad with obscenities and racial epithets. On LaMar's order, Grinnell opened Svette's cell, where LaMar and Curry beat Svette over the head with a baseball bat and a shovel. LaMar started to leave the cell but returned to beat Svette again after noticing that Svette's legs were moving.

Svette remained alive after the death squad left his cell. A short time later, on Grinnell's instructions to make sure all of the victims in L–6 were dead, inmate Eric Girdy struck Svette across the head twice more with a baseball bat. Svette continued to live after Girdy's beating and was still alive after inmate Robert Bass, on orders from one of the Muslim inmates, dragged Svette's body to a ramp near a prison recreation area. Svette eventually died after yet another inmate, Freddie Frakes, beat him yet again with a baseball bat.

After finishing their rampage, LaMar and the others left L–Block and joined the large contingent of inmates gathered in the recreation yard. Many of the participants in the L–6 killings remained together and discussed what had transpired. During this time, LaMar saw inmate Dennis Weaver in the recreation yard and told Curry, "I wish Weaver was in there. I'd have killed him, too."

Early the following morning, law enforcement officers surrounded the approximately three hundred inmates gathered in the recreation yard and herded them to a gymnasium on the SOCF grounds, where the inmates were handcuffed and taken to various cells around the prison. LaMar occupied a cell in K–Block with nine other inmates: Scales, Frezzell, Weaver, William "Geno" Washington, Jeffrey Mack, Michael Childers, Ricky Rutheford, William Bowling, and John Malveaux. These ten inmates remained in the cell without incident for the rest of the day.

The next day, however, tensions began rising in the cell. LaMar and Scales began harassing Weaver, accusing him of being a snitch and telling him that "all snitches should be killed." Weaver denied being a snitch and urged his fellow

cellmates to protest what he perceived as mistreatment of the inmates who were not involved in the riot. LaMar became incensed by Weaver's comments, yelled "shut up, snitch," punched Weaver in the face, and relegated him to a corner of the cell. Scales and Mack also joined in the attack on Weaver. LaMar later ordered that Weaver, Malveaux, Bowling, and Childers be tied up.

Later that day, LaMar announced to the cellmates that "I want Mr. Weaver dead. I want that snitch dead right now." LaMar then accused Bowling of being a snitch and threatened to kill Bowling if Bowling did not kill Weaver. LaMar untied Bowling, handed him some string, and watched Bowling choke Weaver. LaMar also threatened Rutheford, who then aided Bowling in the assault by holding Weaver's feet. LaMar became impatient with Bowling's progress and told Childers, "[I]f you want to live, if you ain't no snitch, then you help kill him." LaMar then untied Childers, who complied with LaMar's order by choking Weaver, using the ropes with which LaMar had tied Childers's wrists. When Childers began hitting and kicking Weaver, LaMar told him to "just strangle him" because LaMar wanted "to make it look like he hung hisself." LaMar aided Childers by stuffing toilet paper and pieces of plastic down Weaver's throat in an effort to silence him. Weaver eventually died while Childers was choking him.

After Weaver died, LaMar instructed Bowling and Malveaux to move the body to a corner of the cell. He also ordered them to tie a string from a cell mattress around Weaver's neck "and hook it to the coat hook to make it look like a suicide." And before corrections officers removed Weaver's body, LaMar instructed everyone in the cell to tell them that Weaver had killed himself.

*State v. LaMar*, 767 N.E.2d 166, 179–82 (Ohio 2002).

LaMar was tried by jury and, for the five killings, was convicted of a total of nine counts of aggravated murder. (J.A. vol. 2 at 661–63.)

For each of the first day's killings—those of Depina, Vitale, Staiano, and Svette—LaMar was convicted under two different theories: prior-calculation-and-design murder and felony murder. The jurors also convicted him of the four aggravating circumstances attached to each of these eight counts of aggravated murder: one, he committed the murder while a prisoner in a detention facility (the "murder-in-prison" aggravator); two, he had previously been convicted of murder (the "prior-murder" aggravator); three, the present murder was part of a course of conduct in which he purposely killed or attempted to kill two or more people (the "mass-murder" aggravator); and four, he committed the present murder while committing kidnapping (the "kidnapping" aggravator). (J.A. vol. 1 at 492–502; *id.* vol. 2 at 535–36, 543–44, 551–52, 556–57, 561–62, 566–67, 576–77, 581–82, 662–63.)

For the Weaver killing, however, only prior-calculation-and-design murder was charged and only the murder-in-prison, prior-murder, and mass-murder aggravators were attached. The jurors convicted LaMar of this count and these aggravators. (J.A. vol. 1 at 502–03; *id.* vol. 2 at 571–72, 662–63.)

For the two Staiano aggravated-murder counts, the jurors recommended and the trial court imposed a life sentence with parole eligibility after 30 years. (J.A. vol. 2 at 610, 618, 661, 664–65, 679.) For the other seven aggravated-murder counts, the jurors recommended and the trial court imposed four sentences of death, one for each person murdered: Depina, Vitale, Svette, and Weaver. (J.A. vol. 2 at 605, 608, 614, 617–18, 661, 664–65, 677–79.) The court ordered all sentences served consecutively. (J.A. vol. 2 at 665; *see also id.* at 679.)

LaMar unsuccessfully sought relief via direct appeal, *State v. LaMar*, No. 95CA31, 1998 WL 514548 (Ohio Ct. App. Aug. 13, 1998) (unpublished), *aff'd*, 767 N.E.2d 166 (Ohio 2002), *reh'g denied*, 770 N.E.2d 1050 (Ohio 2002), *cert. denied*, 537 U.S. 1057 (2002), postconviction proceedings, *State v. LaMar*, No. 98 CA 23, 2000 WL 297413 (Ohio Ct. App. Mar. 17, 2000) (unpublished), *juris. denied*, 731 N.E.2d 1140 (Ohio 2000), *cert. denied*, 531 U.S. 1055 (2000), motions for new trial, *State v. LaMar*, No. 94-CR-136 (Lawrence C.P. Apr. 24, 2001) (unpublished), *aff'd*, No. 01CA17, 2002 WL 31518186 (Ohio Ct. App. May 8, 2002) (unpublished), *juris. denied*, 775 N.E.2d 856 (Ohio 2002), and a *Murnahan* motion (Ohio's vehicle for bringing appellate-counsel-ineffectiveness claims, *see State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992)), *State v. LaMar*, No. 95CA31 (Ohio Ct. App. Feb. 13, 2004) (unpublished), *aff'd*, 812 N.E.2d 970 (Ohio 2004) (per curiam), *reh'g denied*, 815 N.E.2d 680 (Ohio 2004), *cert. denied*, 543 U.S. 1168 (2005).

In 2004, LaMar filed a federal habeas corpus petition raising 25 claims. The Warden argued that the petition was time-barred. The district court held that LaMar was entitled to statutory tolling, but denied the petition. *LaMar v. Ishee*, No. 1:04-cv-541, 2010 WL 5574467 (S.D. Ohio July 30, 2010) (unpublished). The district court also denied LaMar's motion to amend his federal petition because any amendment was barred by the statute of limitations.

LaMar appeals. The Warden cross-appeals on the issue of whether LaMar's federal petition was time-barred.

The district court granted LaMar a certificate of appealability on five claims: 1) whether the State withheld favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 2) whether the trial court erred in refusing to sever the Weaver count from the remaining charges; 3) whether the State presented insufficient evidence of the kidnapping aggravator; 4) whether the prosecutor committed misconduct; and 5) whether the district court erred in denying LaMar's motion to amend his federal petition on the ground that any amendment was barred by the statute of limitations. *LaMar v. Ishee*, No. 1:04-cv-541, 2011 WL 2555351 (S.D. Ohio June 6, 2011) (unpublished); *LaMar v. Ishee*, No. 1:04-cv-541, 2011 WL 2555354 (S.D. Ohio June 27, 2011) (unpublished). This court declined to expand the COA. The Warden's cross-appeal does not require a COA. *See* Fed. R. App. P. 22(b)(3).

LaMar filed his federal petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), whose standards therefore govern. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). District court rulings on legal questions and mixed questions of law and fact are reviewed de novo. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). De novo review does not extend, however, to the state court's conclusions. This court may not grant habeas relief on any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that was 1) contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court or 2) based on an unreasonable determination of the facts in light of the evidence presented to the state courts. *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006) (citing 28 U.S.C. § 2254(d)). The petitioner carries the burden of proving that this standard has been met. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

In analyzing whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions, not the dicta. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

To violate the unreasonable-application clause, after identifying the correct governing legal principle from the Supreme Court's decisions, the state court decision must (a) unreasonably apply it to the facts, or (b) either unreasonably extend or unreasonably refuse to extend a legal principle from Supreme Court precedent to a new context. *Williams*, 529 U.S. at 407–08. The state-court application of Supreme Court precedent must have been "objectively unreasonable," not simply erroneous or incorrect. *Id.* at 409–11.

The contrary-to/unreasonable-application analysis does not apply to claims that the state court resolved without deciding the federal constitutional issues, as when the claims were held procedurally barred. Instead, if the federal court reaches their merits, they are reviewed under pre-AEDPA law (de novo review applied to legal or mixed questions). *Maples v. Stegall*, 340 F.3d 433, 436–37 (6th Cir. 2003). State-court factual findings are presumed correct unless the applicant rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## II.

We need not decide whether LaMar's petition was timely or saved by equitable tolling because his petition fails on the merits. The Warden cross-appeals from the judgment of the district court, arguing that LaMar's habeas petition was untimely and is not saved by equitable tolling. AEDPA's one-year statute of limitations is not jurisdictional. *See Day v. McDonough*, 547 U.S. 198, 205–206 (2006). Because untimeliness is not a jurisdictional bar to review, we may assume the petition was timely and proceed to uphold the denial of relief on the merits. *See Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006).

## III.

LaMar's *Brady* claim fails because, even if favorable evidence was suppressed, LaMar was not prejudiced. A prosecutor violates *Brady* when he does not disclose evidence that is favorable to the accused and material to guilt or punishment. *See Brady*, 373 U.S. at 87. Evidence is favorable if either exculpatory or impeaching, *see Strickler v. Greene*, 527 U.S. 263, 281–82 (1999), and material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted). A reasonable probability

is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (internal quotation marks omitted). This is lower than the more-probable-than-not standard, *see id.*, but the difference between the two "is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (internal quotation marks and citation omitted). In evaluating whether this reasonable probability exists, the court considers the undisclosed evidence collectively. *See Kyles*, 514 U.S. at 436–37, 436 n.10. The evidence must also have been "suppressed by the State, either willfully or inadvertently." *Strickler*, 527 U.S. at 282. The defendant has the burden of proving a *Brady* violation. *See id.* at 291, 296; *see also Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). LaMar argues that the state suppressed favorable evidence material to his guilt. Some of the evidence identified by LaMar was not suppressed. The remaining evidence, even if it was suppressed, was not material.

Some of the evidence urged on appeal as part of LaMar's *Brady* claim was disclosed before trial. According to LaMar, the statements of inmate Michael Trocadero were suppressed by the State. But Trocadero made many statements (*see* J.A. vol. 10 at 4779–803, 4921) and some were revealed to LaMar before trial. (J.A. vol. 10 at 4890–91.) With one exception, those statements LaMar proffers in support of his *Brady* claim are statements he knew about before trial. (*Compare* J.A. vol. 10 at 4890 *with* First Br. 54, 65–66 (both discussing Trocadero statements regarding inmates Robert Goodgame, Charles Outlaw, Emanuel Newell, and Anthony Copeland.)) LaMar also claims that the State suppressed the statements of Jeffrey Simmons. Defense counsel obtained those statements from the prosecutor's office before trial. (R.E. 165 at 346–48, 358–61, PgID# 3559–61, 3571–74; *also compare id.* at 358–59, PgID# 3571–72 *with* J.A. vol. 10 at 4805–31; *see also* J.A. vol. 1 at 270.) Accordingly, this evidence was not suppressed.

The remaining alleged *Brady* evidence consists of police interviews with 12 inmates concerning the first day's killings. None of the evidence concerns the Weaver killing. We will assume that this evidence was suppressed. This suppressed evidence does not undermine confidence in the verdict because the proffered *Brady* evidence is either consistent with the State's theory or contradicted by strong evidence of LaMar's guilt. At trial, witnesses disagreed

on certain details, including the order of some of the deaths and the death squad's exact membership, but the State established the following theory of events.

On the first day, it was LaMar who suggested killing the snitches and LaMar who approached a Muslim leader to ask, "If we kill the snitches, could we be let out to the yard so we don't be a part of this?" And after the Muslims granted permission for the killings, it was LaMar who led the death squad. (*LaMar*, 767 N.E.2d at 179, ¶¶ 3–5; *id.* at 212, ¶¶ 194, 197; J.A. vol. 3 at 1076 (internal quotation marks omitted).)

The Ohio Supreme Court placed the number in that squad at nine, *see LaMar*, 767 N.E.2d at 179, ¶ 5, but estimates at trial varied. (*See* J.A. vol. 5 at 2281 (Robert Bass: "About five or six, somewhere"), 2492–93 (Anthony Walker: "I don't know. About maybe eight [total]. I don't know. It was only a few other guys, but I can't say for sure"); *id.* vol. 6 at 2832, 2859 (Louis Jones: eight total).) Besides LaMar, the Ohio Supreme Court listed these as members: Louis Jones, Derek Cannon, Hiawatha "Pittsburgh" Frezzell, Eric "Tiger" Scales, Derrick Mathews, Rasheem Matthews, Albert "Da-Da" Young, and Gregory Curry. (*LaMar*, 767 N.E.2d at 179, ¶¶ 3, 5; *but see* J.A. vol. 5 at 2455–57, 2477–78, 2484–85 (testimony naming Devin Postell as a member—which, if he really was also a member, would bring the total up to ten); *see also* J.A. vol. 6 at 2643–44 (another witness not sure whether Postell was there or not).)

"The men . . . wore masks fashioned from T-shirts, towels, and bandannas." *LaMar*, 767 N.E.2d at 179, ¶ 5; *see also id.* at 179, ¶ 6. Witnesses differed as to whether LaMar himself was masked when they saw him. Three said, yes (*see* J.A. vol. 3 at 1077; *id.* vol. 5 at 2372, 2377, 2380–81, 2464–65; *id.* vol. 6 at 2725, 2829, 2832, 2859); one, no (*see id.* vol. 6 at 2642); and one, that he was "almost sure" LaMar had a T-shirt over part of his face, but that the witness could still recognize LaMar through his walk and physique. (J.A. vol. 5 at 2281.) All those who said LaMar was masked were emphatic that they nonetheless knew it was LaMar—because of his voice (J.A. vol. 5 at 2380–81) or because, as two witnesses testified, they actually saw him putting the mask on (*see id.* vol. 6 at 2725, 2829).

LaMar's gang first attacked two victims they did not kill: Andre Stockton and Ellis Walker. Then the killings began. First was Darrell Depina, whom LaMar beat, dragged from the

cell, then beat some more, other members of the death squad joining in. Depina died from his injuries. *See LaMar*, 767 N.E.2d at 180, ¶¶ 6–7.

Next was Bruce Vitale. LaMar beat him on the head with a shovel, knocking a tooth out of his mouth. Vitale tried crawling under his bed, but LaMar and Curry just dragged him out of the cell and beat him some more, other members of the squad joining in. "Vitale was still alive when the group left him but died after Frezzell and another member of LaMar's group [not LaMar] stabbed and beat him again." (*Id.* at 180, ¶ 8; *compare* J.A. vol. 3 at 1078.)

Then came the Albert Staiano killing. LaMar had gone to Thomas Taylor's cell, but a Muslim inmate intervened and said Taylor was under Muslim protection. *LaMar*, 767 N.E.2d at 180, ¶ 9. LaMar disagreed with this decision: "No. If he's in there, he's a snitch. Fuck it. Kill him." (J.A. vol. 5 at 2519 (internal quotation marks omitted); *see also LaMar*, 767 N.E.2d at 180, ¶ 9.) Taylor denied the charge. LaMar agreed to spare him if Taylor killed Staiano, in the next cell. Taylor agreed. LaMar ordered both cells opened and told one of the other inmates to give Taylor a baseball bat. Staiano tried running, but Frezzell tripped him. Then Taylor beat Staiano over the head with the bat and, after that broke, a fire extinguisher. "Other death-squad members, not including LaMar, joined in the assault and stabbed Staiano repeatedly." *LaMar*, 767 N.E.2d at 180, ¶ 9. LaMar ordered Taylor back to his cell.

That killing done, the death squad went to a cell occupied by Michael Trocadero and four or five other inmates. A Muslim representative told LaMar the Muslim leadership did not want them killed, so the death squad started to leave, going by the cell of William Svette, "an elderly inmate who used a walker to move himself around." *Id.* at 180, ¶ 10. The old man was already injured, someone else having beaten him up before the death squad even came by. (*See* J.A. vol. 5 at 2394, 2482 (face beaten up), 2483 (Svette "was already bleeding. Blood was already on the floor and stuff. So somebody else had—already had hit him"); *see also LaMar*, 767 N.E.2d at 180, ¶ 10.) As the death squad passed by, Svette began cursing them and hurling racist epithets. LaMar ordered his cell opened, then LaMar and Curry entered and beat Svette over the head with a baseball bat and shovel. LaMar started to leave, but noticing that Svette's legs moved, returned to beat him again. LaMar and his men then left. But Svette was still alive. Shortly after, a Muslim representative ordered inmate Eric Girdy to make sure all of the death

squad's victims were actually dead.  He "struck Svette across the head twice more with a baseball bat." *LaMar*, 767 N.E.2d at 180–81, ¶¶ 10–11.  Still Svette did not die, continuing to live even after another inmate, on orders from a Muslim, "dragged Svette's body to a ramp near a prison recreation area." *Id*.  Svette finally died "after yet another inmate, Freddie Frakes, beat him yet again with a baseball bat." *Id*.

That same day, on order of the Muslims, there was at least one other killing (*see, e.g.*, J.A. vol. 5 at 2402–04) and one attempted killing (*id.* vol. 6 at 2721–22, 2753–63, 2766–67), but LaMar had nothing to do with them.  (*See also* J.A. vol. 3 at 1074 ("Muslim and non-Muslim inmates participated in numerous killings, assaults, and kidnappings during the [entire course of the] riot").)

In his attempt to undermine the State's theory of events, LaMar cites the interviews of Willie Kastner, William Turner, Tyronne Golphin, David Hackett, Daniel Davidson, Gerald Kelly, Michael Jones, Daniel Belcher, Reuben Brazzile, Michael Trocadero, Samuel Batson, and James Edinbaugh.  Even if these interviews had been disclosed to the defense, there is not a reasonable probability that the result of the proceeding would have been different.

First, Willie Kastner told officers that, about an hour before Vitale's body was carried out and placed at the bottom of the ramp, he and Vitale had been sitting between L-3 and L-4 when inmate Dewitt Campbell stopped, grabbed Vitale by his shirtfront, and said, "Come with me[,] bitch[;] we have plans for you."  Campbell then took Vitale to L-6.  On the way, Campbell was joined by two other black men who were masked.  (J.A. vol. 10 at 4926, 4935–36, 4939, 4942-44.)  LaMar argues this indicates that it was these men who kidnapped Vitale and (LaMar implies) murdered him.

But Kastner also said that, after taking Vitale into L-6, Campbell "came right back out." (J.A. vol. 10 at 4939.)  No mention is made of Campbell's being out of breath or blood-spattered, as might be expected after a brutal beating.  LaMar's theory of Campbell as the murderer is much too weak to undermine the three eyewitnesses—all of them actually in L-6—who described seeing LaMar and his gang kill Vitale.  (*See* J.A. vol. 3 at 1078; *id.* vol. 5 at 2369–72, 2377, 2380, 2390–91, 2400, 2402, 2446, 2456–58, 2461–62, 2477, 2484–85, 2511–13, 2518, 2595–98; *id.* vol. 6 at 2644, 2649–50, 2660–64, 2839–47.)

Nor does adding the two masked men to the equation change this result. One could speculate that, after Campbell left them, they killed Vitale. But there is no evidence of this. There is also no evidence of who they were. If under those masks were two members of LaMar's gang, this would vary the sequence of events slightly, but would not change the ultimate result: that, as three witnesses testified, LaMar and his gang killed Vitale. Then again, the masked men may not have been part of the death squad. That does not help LaMar either, for it is actually more consistent with the State's case. A natural reading of Kastner is that he is not describing an alternative version of events. He is describing a small part of the original seizure of suspected snitches: the means by which the Muslims rounded up suspected snitches and placed them in those cells where, later, LaMar found them. (*See LaMar*, 767 N.E.2d at 179, ¶ 2; *id.* at 195, ¶ 79; *see also* J.A. vol. 5 at 2369 (witness describing events in L-6: "They had brought some people they considered as hostage snitches in, and they was locked on the bottom range"), 2602 (witness testifying that Depina, Vitale, and Staiano were from a whole different block, so—witness surmised—they must have been brought to L-6 by the Muslims).)

Second, varying his theories, LaMar cites the statement of William Turner for a motive for someone else to have killed Vitale. Turner says that inmate Stanford "Muscles" Harris had been romantically involved with Vitale, and after they broke up, Harris had threatened that, sooner or later, he was going to get him. (J.A. vol. 2 at 649, 752–53.) But motive is not the same as action. Turner admits that he did not see Harris get Vitale. (J.A. vol. 2 at 752–53.) This evidence does not even mildly undermine the testimony of three witnesses describing the action they claim to have seen performed right before their eyes: LaMar and his men getting Vitale.

Third, a version of Vitale's death different from the State's is offered by Tyronne Golphin. He says he saw an inmate named Edward Julious and five or six others beating Vitale, Julious beating him in the head with a mop. (J.A. vol. 10 at 4926, 4976–77.) The State's case had not named Julious as part of the death squad. Moreover, Golphin described the attack as beginning in L-6, but finishing in the hallway, outside L-6, where they had chased Vitale when he tried to run. (J.A. vol. 10 at 4976–77.) The State's theory had been that the attack began in Vitale's cell and spilled outside it (when LaMar and Curry dragged him out), but had not left L-6.

The differences between Golphin's and the State's versions of events are not significant. Golphin does not name the five or six others, so LaMar could have been one of them. And the death squad was masked—either all of them (J.A. vol. 5 at 2372, 2377, 2464; *id.* vol. 6 at 2829, 2832, 2859) or some (*id.* vol. 5 at 2583; *id.* vol. 6 at 2642–44, 2725). Either way, this would explain Golphin's mistakenly naming Julious or the State's witnesses mistakenly *not* naming him. Moreover, the jury already knew that even the State's witnesses' sometimes disagreed about how many were in the death squad and who exactly was in it. (*Compare* J.A. vol. 5 at 2381–82, 2385, 2391, 2437–38, 2455–57, 2477–78, 2484–85 (Anthony Walker: naming Young and Postell as members) *with id.* vol. 6 at 2825–28, 2832, 2835–36, 2839–43, 2849, 2853, 2855, 2857, 2862, 2872, 2874–75 (Louis Jones: naming all the members, including himself, but *not* listing Young and Postell); *see also LaMar*, 767 N.E.2d at 179, ¶ 5 (giving real names of inmates Jones knew only by their nicknames).) Neither disagreement about the exact death-squad membership list nor disagreement about just how far outside Vitale's cell the attack spilled is enough to undermine confidence in the main points of the State's case.

Fourth, LaMar cites the statement of David Hackett, who also named other inmates as part of the death squad. Hackett indicated that, on that first day, he was going by L-6 when he saw a group of inmates taking people who had been locked in the cells out of those cells one at a time, then taking turns stabbing them. He saw one member of the group, Aaron Jefferson, stab a white inmate. (J.A. vol. 10 at 4947–49, 4951–54.) From other indications in the statement, this appears to be a description of Vitale's murder. (*See also* J.A. vol. 5 at 2390, 2446, 2595 (stating that Vitale was white).) Hence, this boils down to an allegation that Jefferson—someone not named in the State's case—stabbed Vitale. But even the State's case said he was stabbed by someone other than LaMar. And for the reasons already explained, it does not undermine the State's case against LaMar to allege that inmates other than those named by the State's theory were members of the death squad.

Fifth, LaMar pieces together statements made by Hackett and Daniel Davidson to contest the time of Vitale's death and the identity of the person delivering the death blow. Hackett describes inmates, after the L-6 killings, moving the dead from L-6 out to the yard. (*See* J.A. vol. 10 at 4947–49.) In describing the dragging out of Vitale, Hackett says, "They thought he

was dead." (J.A. vol. 10 at 4949.) Hackett does not expand on this, but from the phrasing, LaMar infers that Hackett is saying the inmates were mistaken and that Vitale was not yet dead.

LaMar's theory requires an inference. Two pages later, Hackett also said, "Everybody that they assumed was dead, they put 'em on a blanket and drug 'em down the ramp as you go out the doorway." (J.A. vol. 10 at 4951.) Hackett clearly is implying that the inmates may have sometimes been mistaken about who was and was not already dead—and may even be implying he knew for a fact the inmates were mistaken in one or more instances—but is not necessarily implying they were mistaken in Vitale's specific case. Hackett, seeking accurate summary, may simply have been indicating that he did not know whether the inmates were correct in classifying Vitale among the already dead.

Even assuming LaMar is correct in his interpretation of Hackett's statement, this establishes at most a difference of opinion. Hackett thought Vitale still alive; other inmates thought him dead. It should be pointed out that there was another person who also thought Vitale already dead: fellow provider of alleged *Brady* material Willie Kastner. (*See* J.A. vol. 10 at 4937, 4941.) At any rate, it is not enough to raise doubt about time of death. LaMar must raise doubt about cause of death: that, contrary to the State's case, it was not LaMar and his death squad, aiding and abetting each other, who killed Vitale, but rather someone else, unassociated with them, who delivered the death blow later on.

To provide that next link, LaMar relies on Davidson's statement. Davidson says that, on that first day, four to five hours after the riot started, he saw an inmate lying on a ramp and moving around as though he was in pain. Standing over him, beating him in the head with a baseball bat four to five times, was Freddy Frakes (*see* J.A. vol. 2 at 756–57, 759–61; *see also id.* at 641, 648–49)—the same Freddie Frakes who finished Svette off with a baseball bat. (*See LaMar*, 767 N.E.2d at 181, ¶ 11.) Davidson did not know the victim, but he was white, medium built, in his late 20s, had dark brown hair and a mustache. (J.A. vol. 2 at 756–58.) Frakes then walked to the other side of the ramp and began beating Depina, who was lying there. When Davidson asked Frakes what he was doing, "[h]e said he was making sure that the snitches were dead." (J.A. vol. 2 at 760; *see also id.* at 641, 648–49.)

LaMar argues that the description of the unnamed first victim does not fit the elderly Svette, but "generally fits" Vitale. Tying this with Hackett's evidence, LaMar then argues that this shows Vitale died not when the State's theory said he did, but later, and "potentially" shows that he was killed not by LaMar and his death squad, but by Frakes.

This is extremely weak. Davidson did not say there were only two bodies on that ramp. He said there was "a bunch of them"—"[a]t least a dozen." (J.A. vol. 2 at 759.) That one of that dozen or more "generally" fit Vitale's description does not mean it was Vitale. (*See also* R.E. 32, App., State's Exs. 26 A–B, D, G–H (photos of Vitale alive and dead: *no* mustache); J.A. vol. 7 at 3248–49, 3253, 3426–28 (photos admitted).) Even assuming, per LaMar's inference from Hackett's implication, that Vitale did not die in L-6 after being beaten and stabbed by the death squad, but lingered to die on the ramp, it does not follow that he was the first inmate Frakes killed or that Vitale was still alive, when Frakes showed up, to even *be* killed. There is no substantial likelihood that use of the Hackett-Davidson evidence would have brought about a different result.

Next, LaMar offers another statement by Hackett. When Hackett was going by L-6 on that first day and saw a group of inmates taking turns stabbing other inmates, he first saw, as already described, Aaron Jefferson stab a white inmate. But then Hackett saw a fat or heavyset black inmate wearing a scarf. This inmate was going to be killed, but pleaded for his life and was recruited into killing someone else. The heavyset black inmate then stabbed a white inmate. (J.A. vol. 10 at 4947–49, 4951–54.) Finally, Hackett said that an inmate called "Peanut" told him that inmates called "Zeus" and "Frog" had participated in some murders, but Hackett did not know which ones. (J.A. vol. 10 at 4959–61.)

This is not *Brady* material. The second murder described appears to be Taylor's killing of Staiano. (*See* J.A. vol. 6 at 2695 (stating Taylor was not tall, but large, strong), 2853 (stating Taylor was black); R.E. 32, App., State's Exs. 22A–G (photos: indicating Staiano was white); J.A. vol. 7 at 3248, 3252, 3431–32 (photos admitted).) To the extent this indicates that Taylor was coerced into killing, it supports the State's case. Of course, Hackett has him stabbing Staiano, whereas the State had Taylor beating Staiano to death and the stabbing done by other death-squad members when they joined in at the end. That does not get LaMar very far. Taylor

admitted performing the beating. (J.A. vol. 5 at 2518–23, 2607–08, 2614–15; *id.* vol. 6 at 2695–96.) And it is not disputed that Staiano died from it. (*See* J.A. vol. 7 at 3347 (coroner: "[T]here was a massive fracture of the skull so great that the brain could be removed from the skull without any significant additional dissection on our part"), 3351 (coroner: Staiano "died from the head injuries which are secondary to blunt trauma").) Hackett's evidence does nothing to undermine confidence in the State's case for the Staiano killing. The allegations regarding Zeus and Frog are too vague to undermine anything because the killings by LaMar's death squad were not the only killings.

Next, LaMar cites another statement by Davidson. As already alluded to, four to five hours after the riot started, Davidson saw Freddy Frakes "making sure that the snitches were dead" by beating them with a baseball bat. Davidson did not know the first victim Frakes beat. But Davidson was sure he knew who the second one was—Depina. He was lying on the ramp, still moving, when Frakes walked over to him and beat him in the head with the baseball bat about "three good times." (J.A. vol. 2 at 760–61; *see also id.* at 641, 648–49.)

LaMar cites this as evidence that Depina was killed not by LaMar and his death squad, but by Frakes. In other words, Depina's murder somewhat paralleled Svette's: when LaMar and the death squad left, the victim was still alive, only to be finished off later by Frakes—or, in Svette's case, by Girdy *and then* Frakes. *See LaMar*, 767 N.E.2d at 193, ¶ 69. But the jurors still found LaMar guilty of killing Svette. And on direct appeal the Ohio Supreme Court upheld this finding against a sufficiency challenge. *Id.* at 192–93, ¶¶ 63–69. The court thought the jury "well within its province" to infer that LaMar had struck one of the fatal blows. *Id.* at 193, ¶ 68. Nor was that conclusion changed by the fact that Girdy and Frakes "finished Svette off." The court held that the evidence supported "an inference that LaMar's actions bore a causal connection to Svette's death." *Id.* at 193, ¶ 69. "An offender who has inflicted injuries capable of causing death cannot escape culpability for homicide simply because intervening assailants have inflicted injuries that also contributed to the victim's death." *Id.*

The same reasoning applies here. Depina died from acute head injuries (J.A. vol. 7 at 3383)—two of them (*id.* at 3405). The jurors were instructed on aiding and abetting (J.A. vol. 8 at 4053–54), therefore if either LaMar or another member of the death squad struck one of the

fatal blows with specific intent to cause death that is enough. *See Bradshaw v. Stumpf*, 545 U.S. 175, 184 (2005). LaMar hit Depina in the head with a baseball bat. Other death-squad members hit him there too. (*Compare* J.A. vol. 5 at 2385, 2401–02 *with id.* at 2386, 2442–43, 2445.) Confronted by the Death-Squad/Girdy/Frakes sequence, the jurors still found beyond a reasonable doubt that LaMar killed Svette. It is not reasonably probable that the one-step-simpler Death-Squad/Frakes sequence would affect their making a comparable finding here. It is not substantially likely that use of the Davidson statement would have changed the outcome of this case.

Sixth, LaMar cites the statement of Gerald Kelly regarding Ellis Walker. Under the State's theory, Walker was the second man beaten by the death squad and the last before the murders began. Kelly said he was next to Walker in the hallway in front, between L-5 and L-6, when inmate Kennedy opened the L-6 doorway and motioned for Walker to come. Kennedy had a baseball bat on his shoulder. Walker went in L-6, and the door was shut. (J.A. vol. 10 at 4980; *see also id.* at 4981, 4983.) LaMar calls this exculpatory, but it appears to be another instance of suspected snitches being rounded up and placed in L-6 cells. This is consistent with the State's theory.

While in that same hallway, about an hour after the riot started, Kelly witnessed another incident. He saw Staiano standing a few people away when two armed members of the Aryan Brotherhood came by, pointed out Staiano, and took him away. Kelly was going into L-3 at the time, so he did not see where they took Staiano, but Kelly says he knew Staiano was in trouble. Kelly speculated it was a "revenged thing" for something that had happened to a fellow Aryan Brother a few months earlier. (*See* J.A. vol. 10 at 4981–84.)

Calling this a "revenge kidnapping," LaMar argues that Kelly's statement shows both motive and opportunity for people other than the death squad to have killed Staiano. Considered in context, this incident was likely another instance of the rounding up of suspected snitches. True, this time it was done by the Aryan Brotherhood. But the Aryans and Muslims had worked out a temporary alliance. A witness specifically testified that the Aryans were warned of the planned riot ahead of time "because it would be a unified effort, and it was a protest by everybody that lived within L block." (*See* J.A. vol. 6 at 2717; *see also id.* at 2765.) It would be

consistent with such an alliance for the Aryans to round up a suspected snitch and turn him over to the Muslims for placement in one of those L-6 cells. Indeed the Muslims had turned someone over to the Aryan Brotherhood. (*See* J.A. vol. 6 at 2791–92.)

Seventh, LaMar cites the statement of Michael Jones that he was an eyewitness to the murder of Svette by Frakes on the L-corridor ramp. That is consistent with the State's case.

Eighth, LaMar cites the statement of Daniel Belcher. Belcher said that inmate John Powers dropped a weight on Svette's head. (J.A. vol. 10 at 4735; *see also id.* vol. 1 at 264–65; *id.* vol. 10 at 4919.) But the State's own witness testified that Svette had been beaten up by someone else before LaMar even got there—beaten up in the face. (J.A. vol. 5 at 2482.) Belcher's statement is consistent with this.

LaMar implies that Belcher's statement would have undermined the State's case that LaMar caused Svette's death, but it does not. The jurors heard testimony that, before LaMar arrived, Svette had been beaten, including in the face, and was bleeding, yet even after that, he could still stand (with the aid of his walker) and speak: he cursed the death squad as it passed. (*See* J.A. vol. 5 at 2393–94, 2453–54; *see also id.* vol. 6 at 2848–49.) They heard testimony that LaMar beat Svette in the head, once or twice with a baseball bat according to one witness, (J.A. vol. 5 at 2394–95), and quite a few times with a shovel according to another witness, (*id.* vol. 6 at 2849–50) and then, after starting to walk away but returning, hit him in the face four or six times, bringing the weapon down directly *into* Svette's face. (J.A. vol. 6 at 2850–52.) There was more than one fatal injury. The one across the face in itself would have killed. But the injuries across the top of the head would have killed independently. (J.A. vol. 7 at 3375–76 (coroner's testimony).) It is not substantially likely that use of Belcher's statement would have changed the result of this case.

Ninth, LaMar cites the statement of Reuben Brazzile, which provides LaMar with a different allegation about Svette's injuries. Brazzile said that inmate Sterling "Death Row" Barnes struck Svette in the head three times with a mop ringer. (J.A. vol. 10 at 4766, 4773.) LaMar suggests that this implicates Barnes in the death squad, when the State's case listed him neither as a member nor as one of the attackers of Svette.

But Brazzile was not describing the death-squad attack. He was describing a follow-up. While in L-1 (*not* L-6), he heard someone say, "Well, these guys that are on the edge of death, why don't we give them death blows[?"] (J.A. vol. 10 at 4773 (emphasis added).) Brazzile continues, "At that time[,] it was decided evidently that Svette would receive a death blow because he was still like hanging on for life and that's when Barnes, Death Row, began to hit him in the head with the mop wringer." (J.A. vol. 10 at 4773.) In Brazzile's account, the L-6 attacks have already occurred. Svette's body was then taken to L-1, where Barnes began striking Svette with the mop wringer and Brazzile's cellmate (either Leroy Elmore or inmate Flannigan) began striking him with a big, thick stick. According to Brazzile, they killed Svette right there in L-1. Then came the order from the Muslim leadership to bring out all the bodies. (*See* J.A. vol. 10 at 4766, 4768, 4772–74, 4778.)

This does not undermine the State's case against LaMar. It merely provides an alternative to the Frakes-finished-Svette-off version or a supplement. Under this scenario, Barnes and Brazzile's cellmate just administered another in the series of beatings Svette received, with the Barnes-Cellmate beating following LaMar-Curry-Girdy but preceding Frakes, Svette not finally dying until Frakes got to him. This does not undermine the State's case that LaMar or his aider and abettor Curry struck at least one of the death blows.

Brazzile also said that inmate Anthony Byrd was a member of the death squad and was involved in Svette's murder. (J.A. vol. 10 at 4767.) LaMar describes this as an allegation that Byrd was "an attacker of Svette," but the summary of Brazzile's statement says "involved in" (J.A. vol. 10 at 4767 (caps removed)), which could refer simply to membership in the death squad, rather than hands-on involvement in killing Svette. Disagreement about the exact death-squad membership list does not undermine the State's case against LaMar. Whether the masked man helping LaMar kill Svette was Curry or Byrd, or whether Curry and Byrd helped LaMar do the job, that still leaves LaMar as a killer of Svette.

Brazzile identified Thomas Taylor as a member of "the security squad" (J.A. vol. 10 at 4769)—the same Taylor who killed Staiano and testified against LaMar. (*See* J.A. vol. 5 at 2494, 2496–615; *id.* vol. 6 at 2622–99.) By "security squad," Brazzile meant participants in the riot who were assigned the duty of enforcing the rules of whatever inmate group controlled that

unit: inmate enforcement officers. (*See* J.A. vol. 10 at 4774, 4777; R.E. 165 at 284–85.) If Taylor was part of the security squad for the Muslim-controlled section, then he would have been a Muslim enforcement officer.

LaMar argues that this contradicts the State's theory that Taylor was not a riot participant and that he killed Staiano only under coercion from LaMar and his death squad. The absence of this evidence was not prejudicial. Two of LaMar's alleged *Brady* witnesses, Hackett and Trocadero—whom, presumably, the State could have called if needed—described Taylor's being coerced into killing. And three witnesses at trial described his being coerced: Taylor himself (J.A. vol. 5 at 2518–23, 2530, 2601; *id.* vol. 6 at 2631, 2633, 2672–74, 2694–96), Anthony Walker (*id.* vol. 5 at 2388–90) and Louis Jones (*id.* vol. 3 at 1078; *id.* vol. 6 at 2853–54). And all three described Taylor's being locked back in the cell once the Staiano killing was done. (J.A. vol. 3 at 1079; *id.* vol. 5 at 2390, 2451–52, 2523; *id.* vol. 6 at 2857–58.) It is not reasonably probable the Brazzile allegation would have undermined all that.

LaMar cites Brazzile for one more allegation, which concerned the State's witness Anthony Walker. Although LaMar indicates that it appears in both the interviewing officer's one-sentence summary of Brazzile's statement (J.A. vol. 10 at 4771) and in the seven-page transcription of the interview (*id.* at 4772–78), the allegation actually appears only in the one-sentence summary: "Inmate Brazzile said that inmate Walker was a member of the security squad and that he was the security officer in L-6 main block." (J.A. vol. 10 at 4771 (caps removed).)

This does not undermine Walker's testimony. Although Walker indicated he was not a participant in the riot (*see* J.A. vol. 5 at 2362–69, 2371), he did testify that, after the Muslims had taken over L-6, a Muslim representative told him to watch the back door and, if Walker heard anything, to let the Muslim know. (*See* J.A. vol. 5 at 2369–72, 2434–37.) Walker testified that he replied, "'All right' " (J.A. vol. 5 at 2435), and did as he was told (*id.* at 2369–72, 2437). That appears to be what Brazzile was alluding to. And the jurors heard the allegation that this sequence of events constituted "working security on the back door," since defense counsel made that exact suggestion to Walker on cross-examination. He replied, "You could say that," but pointed out that he was acting under the coercion of implied threat. (J.A. vol. 5 at 2435.) LaMar

has not shown it reasonably probable that use of Brazzile's statement would have changed the outcome.

Tenth, LaMar cites the statement of Michael Trocadero, whose life was spared because the Muslim leadership wanted neither him nor the other inmates in his cell killed. Out of all the statements he made to investigating officers, the only one both not revealed before trial and cited by LaMar concerns inmate Timothy Williams. And LaMar gets it wrong. He indicates that Trocadero named Williams as one of Staiano's assailants or as somehow being part of that killing (*id.* at 65–66). But, what Trocadero actually said was that Williams "was in L-6 and should have seen the group that murdered and assaulted" Staiano. (J.A. vol. 10 at 4781 (caps removed.))

Trocadero confirms the State's theory on several points. He has Taylor being coerced into killing Staiano (J.A. vol. 10 at 4796–98, 4800) and, the killing done, going back to his cell, where the door is closed upon him (*id.* at 4801). And Trocadero lists LaMar as a death-squad member. (*See* J.A. vol. 10 at 4796–98, 4800, 4802, 4890, 4921.) True, Trocadero did not see LaMar kill and—other than seeing him pull Ellis Walker out of his cell—could not say what part LaMar played. (J.A. vol. 10 at 4796–97, 4802.) But this places LaMar there. (*See* Third Br. 49 (LaMar conceding, in a different context, that "[a] statement noting LaMar at the scene would seem to be consistent with the state's theory").) Moreover, Trocadero has him not only there, but possibly giving the order to kill Staiano. Trocadero was confused about who exactly gave Taylor that order, but based on size, listed LaMar as one of three men, all hooded, who it might have been. (J.A. vol. 10 at 4797–98, 4800; *see also id.* at 4800 ("[I]t threw me off with the hoods, I couldn't positively say, you know what I mean . . .").) All of this undermines any attempt by LaMar to argue, as he attempts with Brazzile's statement, that Taylor was not coerced or, as he attempts with the statements of Samuel Batson and James Edinbaugh, that LaMar was not even there. And Trocadero's statement undermines any attempt by LaMar to link the latter argument with his alibi defense at trial that he was out in the yard when the murders occurred. *See LaMar*, 767 N.E.2d at 182, ¶ 18. Trocadero's statement does not merely fail to help LaMar. It actively hurts him.

Eleventh, LaMar cites the statement of Samuel Batson. Batson named the following as assaulters or killers of Depina: an inmate calling himself "Charles Outlaw" and inmates Abraham Douglas, Rasheem Matthews, and James Robinson. (J.A. vol. 10 at 4736, 4742, 4744, 4746–47, 4920.) Batson named the same four men as assaulters or killers of Staiano. (J.A. vol. 10 at 4737–41, 4743, 4745.) LaMar argues this absence of this information prejudiced him.

Batson's statements, read in context, do not indicate that any of the four men was the sole killer of either Depina or Staiano. And the State's theory listed Matthews as a death-squad member. The statements undermine nothing, let alone clear LaMar of either killing Depina or ordering that Staiano be killed. LaMar stresses that the statements nowhere mention him. Yes, but then neither do they mention Louis Jones, who *testified* to his own involvement. LaMar contends they contradict the State's theory that Taylor killed Staiano at LaMar's order. But Batson does not deal with that issue. He just lists Douglas, Matthews, Outlaw, and Robinson as Staiano's assaulters or killers. Identity of the death-squad members aside, that is consistent with the State's theory that, after Taylor had finished his part, other death-squad members joined in. LaMar stresses that, according to the State's theory, Taylor alone killed Staiano. Although the theory did have Taylor alone delivering the death blows, it also had the other death-squad members, when they joined in, stabbing Staiano repeatedly.

Although the State, unlike Batson, did not list Douglas, Outlaw, and Robinson as death-squad members, that does not undermine the case against LaMar for reasons already explained. The information given by Trocadero provides a useful point of comparison. He too named Outlaw (*see* J.A. vol. 10 at 4780, 4795–97, 4802, 4890, 4921) and Robinson (*see id.* at 4787, 4795, 4798, 4802, 4890, 4921) as death-squad members, yet also named LaMar (*see id.* at 4796–98, 4800, 4802, 4890, 4921). Thus, as Trocadero's statement illustrates, including others does not exclude LaMar.

Twelfth and last, LaMar cites the statement of James Edinbaugh. LaMar cites his Highway Patrol interview (*see* J.A. vol. 10 at 5023–83) for two variations on already dealt-with arguments. One, Edinbaugh names as members of the death squad inmates that the State's theory did not name. (First Br. at 66 (but mistakenly calling Edinbaugh "Simmons").) Two, although mentioning those others, Edinbaugh nowhere in his 61-page interview mentions LaMar.

Again, disagreement about the exact death-squad membership list does not aid LaMar. Nor does the failure to mention him exclude him. Edinbaugh says there were seven to eight people in the death squad (J.A. vol. 10 at 5024, 5038–39), but names only five. (*Compare* J.A. vol. 10 at 5024–25 *with id.* at 5035–38.) That leaves two to three slots open. LaMar could fill any one—and still leave one for Louis Jones, whom Edinbaugh *also* does not name. (*Compare* J.A. vol. 10 at 5024–25 *with id.* at 5035–38.) It is not substantially likely that use of Edinbaugh's evidence would have changed the outcome.

Next, LaMar argues that he should have been permitted to amend his federal habeas petition to include two more subclaims to his *Brady* claim. In these subclaims, LaMar argues that prosecutors withheld information concerning the special treatment given to the prosecution's inmate witnesses and those witnesses' mental health records. Even assuming LaMar should be permitted to amend his petition to include these subclaims, the subclaims are meritless.

LaMar's special treatment subclaim is based on a deposition of Anthony Walker taken during federal habeas proceedings. In his deposition, Walker indicated that he and other inmate witnesses were transferred before trial to Oakwood Correctional Facility, which ordinarily housed inmates with mental-health problems. (R.E. 98 at 20, 31–34, PgID# 1570.) While at Oakwood, he and the others received extra visitation, food, and cigarettes. (R.E. 98 at 31–32, PgID# 1570.) They were assigned night-shift cleaning duties and after they finished cleaning, their cells were left unlocked for the night. (R.E. 98 at 32, PgID# 1571.) Walker stated that he was not told he would receive this treatment beforehand. (R.E. 98 at 33, PgID# 1572.) LaMar argues that, had this evidence been disclosed to him before trial, he could have used it to impeach the prosecution's inmate witnesses.

This is weak impeachment evidence. LaMar has no evidence that the witnesses struck a deal to receive this special treatment or that the witnesses even knew what conditions would be like at Oakwood when they first told investigators their accounts. For the special treatment to provide a motive to lie, the witnesses must have known about the special treatment beforehand. Furthermore, the special treatment described by Walker is overshadowed by the risk of harm from being a witness for the prosecution. In retaliation for agreeing to testify, prosecution witness Stacey Gordon had his face burnt with a hot liquid. (J.A. vol. 6 at 2719–21.) According

to Reuben Brazzile, provider of alleged *Brady* material, one of the rioters' first acts was to break into the unit-office files to learn which inmates were snitches. (J.A. vol. 10 at 4773.) Considering this and the other alleged *Brady* material cumulatively, there is not a reasonable probability of a different result at trial.

LaMar's second additional subclaim is that prosecutors failed to provide the defense with mental-health records of inmate witnesses before trial, but this evidence was either not suppressed by the prosecution or not reasonably probable to change the outcome of the trial. First, LaMar argues that inmate witness Michael Childers believed that a transmitter had been placed in his head by the FBI and that this could have been used to impeach Childers at trial. This evidence was not suppressed; it was turned over to the defense by the prosecution and even used to impeach Childers at trial. (R.E. 165 at 329–31; R.E. 181 at 31–32; J.A. vol. 6 at 3064–67.) Second, LaMar argues that Ricky Rutheford suffered from auditory and visual hallucinations. Had this evidence been disclosed, there is not a reasonable probability of a different outcome. Rutheford testified to the Weaver killing, (J.A. vol. 3 at 1081–83), but so did Childers, (J.A. vol. 6 at 3038–45, 3047–53, 3055–57, 3068–70, 3073–77, 3086–87), and John Malveaux, (J.A. vol. 7 at 3100–17, 3120–26, 3128–33, 3151–55). Childers and Malveaux testified that LaMar gave the orders to kill Weaver and Childers also testified that LaMar shoved plastic in Weaver's mouth. (J.A. vol. 7 at 3041–42, 3049–52, 3070, 3073, 3075–77, 3121). In light of Childers's and Malveaux's testimony, it is unlikely that impeaching Rutheford based on his mental health records would have had much effect. Adding this evidence to LaMar's *Brady* claim, and considering that evidence together, there is still no reasonable probability of a different outcome at trial.

**IV.**

Next, LaMar argues that the trial court denied him his constitutional right to a fair trial by refusing to sever the Weaver count from the remaining charges. Discussing this only as a state-law claim, the Ohio Supreme Court on direct appeal held that the trial court had not abused its discretion in denying LaMar's severance motion. *LaMar*, 767 N.E.2d at 189–90. The district court credited LaMar with raising a constitutional claim, (*see* J.A. vol. 1 at 283), but concluded that the claim was defaulted because it had not been not fairly presented in state court (*id.* at

281–84; *see also id.* at 285) and in the alternative was meritless. (J.A. vol. 1 at 284–86.) Even assuming that LaMar's claim was fairly presented in the state courts, the claim fails because LaMar has not shown that the trial court's denial of his severance motion violated due process.

The burden of showing that the denial of the severance motion rose to the level of a due process violation falls on LaMar. Although the Ohio Supreme Court discussed only the state-law aspect of LaMar's claim, when a state court rejects a federal claim without expressly addressing it, it is rebuttably presumed that the claim was adjudicated on the merits. *See Johnson v. Williams*, 133 S. Ct. 1088, 1091, 1094, 1096 (2013). LaMar has not attempted to rebut this presumption, *see* First Br. at 93 (using AEDPA-deference language), therefore AEDPA deference applies. Misjoinder is unconstitutional only if it results in prejudice so great as to deny a defendant his due process right to a fair trial. *See United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). The burden falls on LeMar to demonstrate prejudice. *Quicksall v. Michigan*, 339 U.S. 660, 665 (1950).

LaMar has not carried that burden. LaMar argues that the purported misjoinder permitted the State to introduce during its case for the four L-6 killings a "plethora of prejudicial evidence" that contaminated the jury's finding on the Weaver killing. The "introduction of evidence of other crimes that would otherwise be inadmissible" can be a source of potential prejudice and the basis for a misjoinder due process violation. *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007). However, as the Ohio Supreme Court ruled, *LaMar*, 767 N.E.2d at 194, and as LaMar concedes, (*see* First Br. at 94), even if the Weaver killing had been tried separately, "some" evidence concerning the L-6 killings would have been admissible to prove the course-of-conduct specification on the Weaver count. LaMar has not identified which evidence admitted at the joint trial would have been inadmissible in a hypothetical separate trial on the Weaver count. Nor has he explained how that inadmissible evidence was so unfairly prejudicial as to violate due process. Accordingly, his claim fails.

## V.

Next, LaMar contends that the State presented insufficient evidence of the kidnapping aggravators and, therefore, that three of his death sentences must be reversed: those for the Depina, Vitale, and Svette killings. LaMar does not challenge the felony-murder counts, even

though those counts were based on the same alleged acts of kidnapping. (*See* First Br. at 96–106; Third Br. at 63–73; J.A. vol. 1 at 129, 132–35.) On direct appeal, the Ohio Supreme Court found the evidence of the aggravators sufficient. *LaMar*, 767 N.E.2d at 192, 194–95, ¶¶ 63–64, 72–80; *see also id.* at 210, ¶ 185. The district court concluded that the evidence was insufficient and that the Ohio Supreme Court's holding to the contrary was objectively unreasonable (J.A. vol. 1 at 319–21, 329–35, 337), but that the error was harmless (*id.* at 335–38). Even assuming that there was insufficient evidence of the kidnapping aggravators, any error was harmless.

The harmless-error rule applies. Ohio is a weighing state. *Wilson v. Mitchell*, 498 F.3d 491, 505 (6th Cir. 2007). If the jury considered an invalid aggravator when deciding that aggravation outweighed mitigation, but a valid aggravator remains, the death sentence must be reversed unless either (a) the error was harmless or (b) aggravation and mitigation are reweighed without the invalid aggravator. *See Brown v. Sanders*, 546 U.S. 212, 217 (2006); *Stringer v. Black*, 503 U.S. 222, 232 (1992). Only a state court may conduct this reweighing, but either a state or federal court may conduct the harmless-error analysis. *See Wilson*, 498 F.3d at 505–08. Because the Ohio Supreme Court upheld LaMar's kidnapping aggravators, the court did not remove those aggravators from the scales when it independently reweighed aggravation and mitigation. *See LaMar*, 767 N.E.2d at 210, ¶ 185. But even assuming the kidnapping aggravators were invalid, valid aggravators remain, and a federal court may determine whether consideration of the invalid kidnapping aggravators was harmless.

LaMar argues that the harmless-error rule does not apply on the theory that the United States Supreme Court's decision in *Brown v. Sanders* requires, except in circumstances not relevant here, reversal of a death sentence whenever the jury has considered an invalid aggravator. This court's caselaw is to the contrary. Even in a post-*Sanders* world, "we continue to hold that federal courts may conduct harmless-error review of invalid aggravating factors even where the state court has not done so." *Wilson*, 498 F.3d at 508 (specifically considering *Sanders*'s effect, *see also id.* at 504–07). LaMar argues that *Wilson* is contrary to *Sanders*, but *Wilson* is controlling precedent and this court is bound by it. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

Any error in considering the kidnapping aggravators was harmless, because the jury would have rendered the same verdicts even without consideration of the kidnapping aggravators. In a harmless-error analysis, the question is whether the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637–38 (1993) (internal quotation marks omitted); *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007). The focus is on the verdict rendered by *this* jury, not a hypothetical reasonable jury. And the question is whether the verdict "actually rendered in *this* trial was surely unattributable to the error," not whether, "in a trial that occurred without the error," the same verdict "would surely have been rendered." *See Sullivan*, 508 U.S. at 279–80; *see also Wilson*, 498 F.3d at 503–504. The three valid aggravators, particularly the mass-murder aggravators, weighed so heavily in favor of death sentences that the death sentences were unattributable to the inclusion of the kidnapping aggravators.

For each person killed on the first day—Depina, Vitale, Staiano, and Svette—LaMar was convicted of two counts of aggravated murder, with the same four aggravators attached to each count: murder in prison, prior murder, mass murder, and kidnapping. For the Weaver killing, there was only one aggravated-murder count and three aggravators attached: murder in prison, prior murder, and mass murder. The Weaver aggravated-murder count did not have the kidnapping aggravator attached. LaMar received one death sentence each for the Depina, Vitale, Svette, and Weaver killings, but a 30-to-life sentence for the Staiano killing.

The decisive factor in the death sentences was LaMar's hands-on involvement. In the Depina-Vitale-Svette killings, LaMar may not have acted alone, but he did beat the victims: repeatedly, brutally, personally. *See LaMar*, 767 N.E.2d at 180–81, ¶¶ 7-8, 10; *id.* at 212, ¶ 194. In the Weaver killing, LaMar "aided [the person who ultimately succeeded in strangling Weaver] by stuffing toilet paper and pieces of plastic down Weaver's throat in an effort to silence him." (*See id.* at 181, ¶ 15; *see also* J.A. vol. 6 at 2979–80, 2982–83, 2986–87, 3041–42, 3049–50.) LaMar's shoving objects down Weaver's throat not only silenced Weaver and prevented him from alerting guards, it also contributed to Weaver's death by asphyxiation. (J.A. vol. 7 at 3391-92 (coroner's testimony).) The jury returned death sentences for each of these four killings. In the Staiano killing, LaMar gave the orders, but struck no blows himself, *id.* at 180, ¶ 9. The jury

returned a life sentence. When LaMar had hands-on involvement in the killing, the jurors returned a death sentence. When he did not, they did not.

The jury legitimately considered LaMar's hands-on involvement as part of the mass-murder aggravator. That aggravator encompasses the "course of conduct involving the purposeful killing of" multiple persons. Ohio Rev. Code Ann. § 2929.04(A)(5) (West 1997) (amended 1997, 1998, 2002). Under Ohio law, the nature and circumstances of a crime can provide a reason why the statutory aggravators outweigh mitigation. *See State v. Davis*, 880 N.E.2d 31, 77, ¶ 326 (Ohio 2008) (prosecutor may legitimately refer to nature and circumstances to explain why aggravation outweighs mitigation); *State v. Stumpf*, 512 N.E.2d 598 (Ohio 1987) (trial court or three-judge panel may rely upon nature and circumstances as reasons supporting finding that aggravation outweighed mitigation).

The kidnapping aggravators had no effect. LaMar received a death sentence when the kidnapping aggravator was absent for the Weaver killing, and received a life sentence when the kidnapping aggravator was present for the Staiano killing. Any variation in the nature and circumstances of the kidnapping also had no effect. In what the prosecution characterized as kidnapping, LaMar dragged Depina and Vitale from their cells before their brutal beatings. *See LaMar*, 767 N.E.2d at 180–81, ¶¶ 7–8, 10. LaMar received death sentences for the Depina and Vitale killings. LaMar did not drag Staiano from his cell, but LaMar still received a death sentence for Staiano's killing. Accordingly, the presence of the kidnapping aggravators did not have substantial and injurious effect or influence in determining the jury's verdict. If there was error, it was harmless.

## VI.

Next, LaMar argues that the prosecutor committed misconduct before and throughout trial. On direct appeal, the Ohio Supreme Court examined each instance of misconduct and denied the claim, either on the merits or under plain-error review. *LaMar*, 767 N.E.2d at 186–87, ¶¶ 37–38; *id.* at 197–98, ¶¶ 91–92; *id.* at 203–09, ¶¶ 121–83. Although the prosecutor sometimes engaged in "questionable conduct," *LaMar*, 767 N.E.2d at 209, the prosecutor's conduct did not violate the Constitution before trial, caused no constitutionally cognizable harm

in the guilt phase, and to the extent any existed in the penalty phase, was cured by appellate reweighing.

The prosecutor's alleged pretrial misconduct in withholding discovery did not deny LaMar due process because there is no general due process right to discovery in a criminal case. Prosecutorial misconduct not invoking a specific provision of the Bill of Rights is reviewed under the general standard for due-process violations: whether the misconduct was so egregious as to deny the defendant a fundamentally fair trial. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45 (1974). LaMar argues that the prosecutor improperly withheld discovery by ignoring the trial court's order to turn over transcripts of inmate-witness statements and refusing the trial court's orders to fully answer defense interrogatories submitted in support of LaMar's motion to dismiss on selective-prosecution grounds. Although the violations alleged are of state law, LaMar contends they were so egregious that they effectively denied him due process. The thrust of LaMar's claim concerns the amount of pretrial discovery given to him. The Due Process Clause "has little to say regarding the amount of discovery which the parties must be afforded," and "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (internal quotation marks omitted).

The prosecutor's misconduct during the guilt phase of the trial did not have substantial and injurious effect or influence in determining the jury's verdict. In deciding prosecutorial misconduct claims, the court considers the effect of any misconduct on the trial as a whole. *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). A relevant consideration is the strength of the evidence against the defendant. *See id.* The case for LaMar's guilt was overwhelming. Five witnesses testified to seeing LaMar with the death squad. Five indicated he was its leader. Two described his attacking Depina and Svette. (J.A. vol. 3 at 1078; *id.* vol. 5 at 2383–85, 2394–95, 2399, 2401–02, 2440–45, 2455, 2477, 2517–18, 2586, 2591, 2593–94; *id.* vol. 6 at 2652–53, 2849–52.) Three described LaMar's attacking Vitale. And three testified to LaMar's coercing Taylor into killing Staiano. As for the Weaver killing, three witnesses testified to it. Two said LaMar gave the orders to kill. Even the third identified LaMar as without doubt the leader of those in the cell who wanted Weaver dead. (*See* J.A. vol. 3 at 1082–83.) And that is the state of the evidence without taking into account LaMar's own witness, William "Geno" Washington,

who testified that LaMar was not involved in the Weaver killing, but was impeached with a prior statement in which Washington told an investigator that LaMar *was* one of the people responsible for the murder.  (*See LaMar*, 767 N.E.2d at 182–83, ¶ 20; *id.* at 195, ¶ 81; J.A. vol. 8 at 3649–50 (Washington admitting making the statement).)

The prosecutor's alleged misconduct during the penalty phase did not violate the Constitution and was cured by appellate reweighing.  LaMar argues that in penalty-phase closing, the prosecutor made improper arguments, including arguing the specifics of the prior murder and trying to make a nonstatutory aggravator out of the fact that LaMar had already been sentenced to life imprisonment, yet he still killed again.  The consideration of nonstatutory aggravators, even if contrary to state law, does not violate the Constitution.  *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003); *see also Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994); *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983).  And even were that not the case, all the alleged prosecutorial misconduct during penalty phase was cured when the Ohio Supreme Court independently reweighed aggravation and mitigation.  *See Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) (citing *Clemons v. Mississippi*, 494 U.S. 738 (1990)).  Accordingly, LaMar's prosecutorial misconduct claim fails.

For the foregoing reasons, the judgment of the district court is affirmed.