RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

QUISI BRYAN,

      *Petitioner-Appellee/Cross-Appellant,*

    *v.*

DAVID BOBBY, Warden,

      *Respondent-Appellant/Cross-Appellee.*

Nos. 15-3778/3834

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cv-00060—James G. Carr, District Judge.

Argued: August 2, 2016

Decided and Filed: December 15, 2016

Before: SILER, ROGERS, and DONALD, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Katherine E. Mullin, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellant/Cross-Appellee. Lori B. Riga, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Katherine E. Mullin, David M. Henry, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellant/Cross-Appellee. Lori B. Riga, Alan C. Rossman, Vicki R. A. Werneke, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, Kathryn L. Sandford, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellee/Cross-Appellant.

    SILER, J., delivered the opinion of the court in which ROGERS, J., joined, and DONALD, J., joined in part. ROGERS, J. (pg. 22), delivered a separate concurring opinion. DONALD, J. (pp. 23–26), delivered a separate opinion dissenting from Part II of the majority opinion.

---

**OPINION**

---

SILER, Circuit Judge.   Warden David Bobby ("the Warden") appeals a district court judgment partially granting the petition of Ohio death-row prisoner Quisi Bryan for a writ of habeas corpus.  *See* 28 U.S.C. § 2254.  Bryan cross-appeals the judgment to the extent it denied habeas relief.[1]  For the following reasons, we **AFFIRM IN PART AND REVERSE IN PART**.

**FACTUAL BACKGROUND**

Bryan supported himself selling drugs and "hitting licks" — robbing *other* drug sellers. *State v. Bryan*, 804 N.E.2d 433, 444, ¶ 8 (Ohio 2004).  In 1995, Bryan was convicted of attempted robbery.  Since being paroled in 1998, Bryan was indicted for theft and receiving stolen property.  Arrest warrants were issued for him for parole violation.

In 2000, when Bryan's vehicle was stopped at a gas station, police officer Wayne Leon pulled behind him.  Both men got out of their cars.  The officer looked at Bryan's temporary tag, noticed it had been altered, and then took Bryan's driver's license so that he could run a police check on both Bryan and the car.   When Leon radioed the police station, Bryan pulled his handgun from his coat and shot the officer in the face.  Officer Leon died instantly.  Bryan retrieved his driver's license and fled in his car.

Other people were present at the gas station during this incident.  In addition to the individuals at the station, Kenneth Niedhammer was waiting at the traffic light next to the gas station.  Niedhammer owned a private security agency and was working that day.  He did not see the shooting, but heard it.  Then (as he would later testify) he saw the officer "lying in the gas station" — "very bloody," "obviously an officer down" — and "at almost the same time" saw "a white Pontiac Grand Prix start to erratically leave the gas station almost running into people."

---

[1]At Bryan's request, the district court granted him a certificate of appealability ("COA") on eight issues, yet he argues only seven on appeal. *See infra* note 4.

Niedhammer activated his siren and flashing lights and gave chase. Twice, Bryan stopped his car, got out, and fired at Niedhammer. Both times Niedhammer returned fire. Eventually, Bryan lost control of his car and crashed.

Bryan fled on foot. At some point, Bryan threw his handgun into a dumpster. He eventually fled to Columbus where he was arrested that same day.

### PROCEDURAL HISTORY

Later that year, the trial jury convicted Bryan of two counts of aggravated murder, two counts of attempted murder (of Niedhammer), the two firearm specifications attached to each of those four counts, and the four death-penalty specifications attached to each aggravated murder. The jury also convicted Bryan of one count of carrying a concealed weapon, one count of carrying a firearm while under disability (being a convicted felon), and one count of tampering with evidence (throwing the handgun into the dumpster).

In the penalty phase, the trial court, for each aggravated murder, merged the first two death specifications (murder of a police officer engaged in his duties and murder for the purpose of killing a police officer) into one (the "killing an officer" aggravator), leaving a total of three death specifications on each aggravated-murder count: 1) killing an officer, 2) escaping arrest, and 3) course of conduct. The jury recommended a death sentence. The trial court sentenced Bryan to death and 33½ years.

Bryan unsuccessfully sought relief on direct appeal, *see State v. Bryan*, 804 N.E.2d 433, 443, ¶ 1 (Ohio 2004); *id.* at 471, ¶ 229 (affirming convictions and death sentence). He then tried but failed to reopen the direct appeal, *see State v. Bryan*, 816 N.E.2d 1078 (Ohio 2004) (denying reopening as untimely); *State v. Bryan*, 817 N.E.2d 891 (Ohio 2004) (striking motion for reconsideration), and tried but failed to obtain relief in state postconviction proceedings, *see State v. Bryan*, No. 87482, 2006 WL 2773646, at *1-2 (Ohio Ct. App. Sept. 28, 2006) (unpublished) (dismissing for lack of a final appealable order); *State v. Bryan*, No. 93038, 2010 WL 1918606, at *1, *12 (Ohio Ct. App. May 13, 2010) (unpublished) (affirming dismissal of postconviction petition), *juris. denied*, 938 N.E.2d 363 (Ohio 2010) (Brown, C.J., dissenting).

In 2011, Bryan timely filed his federal habeas corpus petition with sixteen claims. The district court granted Bryan's petition on his fifth claim (*Batson*), *Bryan v. Bobby*, 114 F. Supp. 3d 467 (N.D. Ohio 2015), but otherwise denied relief on the other fifteen claims.

The Warden timely appealed. The district court granted a COA on Claims 1 (death-qualifying juror Bross), 3 (improperly dismissing potential jurors for their views on the death penalty), 6 (guilt-phase prosecutorial misconduct), 7 (penalty-phase prosecutorial misconduct), 8 (ineffective assistance of counsel ("IAC") in the penalty phase), 9 (guilt-phase IAC), 15 (lethal injection),[2] and 16 (unconstitutional death-penalty scheme). Bryan timely filed his notice of cross-appeal. Both appeals were consolidated and are presently before us.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") constrains "the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by strengthening the presumption of correctness given to state court determination. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A federal court cannot grant habeas relief unless the state court's rejection of the claim: (1) was contrary to or involved an unreasonable application of clearly established federal law, or (2) was based on an unreasonable determination of the facts. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015); 28 U.S.C. §2254(d).

In analyzing whether a state-court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, a federal court may look only to the holdings of the Supreme Court's decisions, not the dicta. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). A state-court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). A state-court decision unreasonably applies that precedent when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts. *Woodall*, 134 S. Ct. at 1705-06. The application must have been "objectively unreasonable, not

---

[2]Bryan has not briefed Claim 15 (lethal injection), thereby abandoning it. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

merely wrong; even clear error will not suffice." *Id.* at 1702 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks omitted)).

When discerning the reasonableness of factual determinations, the "central inquiry is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect." *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009) (citing *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008)). "[A] state-court decision is not unreasonable if 'fairminded jurists could disagree' on its correctness." *Ayala*, 135 S.Ct. at 2199 (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). Ultimately, the habeas petitioner must show that the state court's decision to reject his claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* "[A] reviewing court must be careful not to substitute its own judgment for that of the state court by equating the more stringent standard of 'objectively unreasonable' with the more lax standard of 'clear error.'" *Braxton*, 561 F.3d at 458.

## DISCUSSION

### I. Claims 1 and 3: Juror Death Qualification

#### a. Legal Standard

The test for determining whether veniremembers may be excused because of their views about the death penalty is whether those views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 420-24 (1985). "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). A state-court determination that a veniremember's views fall afoul of *Witt* is a factual finding, state-court resolution of which is presumed correct. *Witt*, 469 U.S. at 428-29.

b.  Claim 1: Juror Bross

Bryan argues that the trial court erred in having ex parte communications with juror Edward U. Bross and then sua sponte death-qualified him again, midtrial, even though he had already been death-qualified during voir dire.

The Ohio Supreme Court on direct appeal divided the claim into two parts: (1) the court held that the ex parte communication claim was forfeited and no plain error had occurred and (2) the rest of the claim failed on the merits. *Bryan*, 804 N.E.2d at 451-53, ¶¶ 67-84.

The district court held that the Warden had forfeited the procedural default defense.**³** However, the court reviewed the entire claim on the merits and found that that the Ohio Supreme Court decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

At the trial, on the first day of evidence, Bross had an off-the-record exchange with the trial judge, during which Bross expressed concern because his photograph had appeared in a recent edition of the Cleveland *Plain Dealer* (newspaper). "The photo shows the backs of the jurors as the jurors stand outside the Sunoco station during the jury view." *Bryan*, 804 N.E.2d at 451, ¶ 68 n.1. The judge said he would look into the matter and told Bross they would discuss it sometime later and that he was not to discuss it with the other jurors. The judge notified both sides' counsel of this colloquy. The next day, the judge again spoke to Bross outside the presence of counsel. Bross expressed reservations about continuing as a juror. On the third day, the judge held an in-chambers hearing, where he and counsel for both sides asked Bross questions. At this hearing, the trial judge determined that the photograph was not the real issue, but that Bross had changed his views of the ability to impose capital punishment. After Bross answered that he would not be able to impose capital punishment, the trial court judge replaced Bross with an alternate juror.

Bryan objects to Bross's disqualification on three grounds: (1) the trial judge erroneously midtrial death-qualified him when he had already been death-qualified; (2) the trial judge

---

**³**While the Warden's procedural default defense may be raised sua sponte, determination of that issue is not needed here as the entire claim fails on the merits.

erroneously sua sponte questioned Bross about his death penalty views at this midtrial death-qualifying; and (3) the trial judge had ex parte discussions with Bross.  Bryan's first argument is essentially this: Once a juror has been death-qualified and seated, the issue may not be revisited — even when his views evolve to the point that, had they been expressed during voir dire, would have required excusal for cause under *Witt*.  Bryan argues that "[a]ll clearly established law on death qualifying a juror requires that questioning be conducted pretrial, prior to hearing any evidence in the case."

Yet Bryan points to no clearly established Supreme Court precedent forbidding midtrial death-qualification of a witness or sua sponte questioning him about his death penalty views midtrial.  Instead, for the midtrial death-qualification, Bryan attaches significance to the fact that prior precedent has always dealt with *empaneling* a death-qualified juror, rather than death-qualifying again an already *seated* juror.  *See, e.g., Holder v. Palmer*, 588 F.3d 328, 338 (6th Cir. 2009) ("The primary purpose of the voir dire of jurors is to make possible the *empaneling* of an impartial jury through questions that permit the intelligent exercise of challenges by counsel." (citing *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) (emphasis added))).  But this misses the point as the question under AEDPA is not whether clearly established Supreme Court precedent has already approved the state-court action, but whether that precedent has forbidden it.  *See* 28 U.S.C. § 2254(d).  Bryan is unable to point to that precedent as it does not exist.  In addition, no clearly established Supreme Court precedent forbids judges from recognizing the implications of the evidence brought before them: intuiting that, beneath the surface of stated concern, lurks the real concern.  And certainly no such precedent forbids judges, after recognizing a potential problem, from holding a hearing on the matter.

As for the ex parte discussions, Bryan argues that it is "unclear" what effect those discussions had on Bross and whether they rendered him no longer impartial.

"[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  Bryan had a hearing at which defense counsel could have questioned Bross about those ex parte discussions.  Counsel did not.  The Ohio Supreme Court held, therefore, that Bryan had forfeited all but plain error.  *Bryan*, 804 N.E.2d at 452, ¶ 83.  The court further held that it was his burden to show

actual prejudice, and he had not. *Id.* at 452-53, ¶ 84. As shown by Bryan's repeated use of the term "unclear," he still has not. Again, he points to no clearly established Supreme Court precedent violated.

c.  Claim 3: Jurors Hawkins and Bailey

Bryan argues that the trial court violated *Witt* by dismissing two properly qualified, nonbiased veniremembers. Both the Ohio Supreme Court on direct appeal, *Bryan*, 804 N.E.2d at 453-54, ¶¶ 101-04, and the district court concluded that this claim is meritless.

The two veniremembers in question are Matilda Hawkins and Dorothy Bailey.

i.  Juror Hawkins

"During voir dire, prospective juror Hawkins expressed her opposition to the death penalty because of Biblical teachings." *Bryan*, 804 N.E.2d at 454, ¶ 102. "I think thou shall not kill. If we killed him, then we['re] no better. Why not just let him repent maybe for life or something?" "I just don't want to kill anyone. . . . I just don't want to be part of the killing." She testified that she did not want to vote for a death sentence and did not want to sign a verdict recommending a death sentence. "I don't want to sign nothing of the kind." At one point, she shook her head to indicate that she could not impose the death penalty.

She also testified that she could follow the law as the judge gave it to her. "I'm supposed to obey the laws of the land. That's what the Bible says, too." "I'll follow the law." The court ruled her not qualified to serve due to her religious views preventing or substantially impairing her ability to perform her duties as a juror. *Witt*, 469 U.S. at 420-24.

Bryan challenges this factual finding on three bases: (1) Hawkins said she would follow the law; (2) the Ohio Supreme Court *found* she "was willing to follow the law"; and (3) the judge misquoted Hawkins. *See Bryan*, 804 N.E.2d at 454, ¶ 102. Accepting these contentions as true, there still is ambiguity in her responses.

While Hawkins claims she would follow the law, she also shook her head indicating that she could not impose the death penalty and that she did not want to vote for a verdict recommending a death sentence. Those responses are the epitome of an ambiguous response.

The trial judge's resolution of that ambiguity — that, when all her verbal and physical statements were combined, she was really saying, "I'll follow the law *except* where the death penalty is concerned" — was not clear error. *Cf. Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

> Furthermore, the trial judge's finding of veniremember bias

> may be upheld even in the absence of clear statements from the juror that he or she is impaired because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or *may be unable to articulate*, or may wish to hide their true feelings." Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State."

*Uttecht v. Brown*, 551 U.S. 1, 7 (2007) (emphasis added, all other alterations in original) (quoting *Witt*, 469 U.S. at 424-25; *id.* at 434).

Bryan's challenge to the trial judge's misquotation of Hawkins is also unavailing. The judge remembered her, when asked whether she could sign the death verdict, saying, "Absolutely not," when she actually said she did not want to. But here is the judge's quote in larger context:

> I said, "Could you sign the form?"

> And she said, "Absolutely not."

> I have to make a tough call. I got to find her not qualified because I don't think that she can in good faith follow the law. I think she has claimed she will, but she indicated also that she wouldn't. So she's going to be not qualified at this point.

As can be seen, when the judge attributed that *absolutely not* to Hawkins, he was giving the sense of what she said, not the literal wording. *See Uttecht*, 551 U.S. at 7. This is confirmed by his subsequent statement that "I think she has claimed she will [follow the law], but she *indicated* [as opposed to said] also that she wouldn't." That summary of what he understood her to really mean was not a clearly erroneous finding of fact. And it did not lead to a clearly erroneous finding of the ultimate fact: that Hawkins was biased.

ii. Juror Bailey

Prospective juror Bailey testified that she was not morally, ethically, or religiously opposed to capital punishment, but also testified that "I really do believe I cannot support the death penalty." When asked whether she could vote for death if aggravation outweighed mitigation beyond a reasonable doubt, she replied, "I really don't know." She testified that she could follow the law, but —after some detailed questioning about aggravation versus mitigation —was asked again whether she could follow the law and this time replied, "I would certainly try." Eventually, she agreed that she would end up following the law, but—questioned by a different person—still felt that she would have a hard time voting for death. The trial judge intervened and further explained the weighing of aggravation and mitigation and the sentences available depending on which outweighed the other. Now, when asked whether she could sign a death verdict, she replied, "I doubt it." Over defense objection, the court found her not qualified.

Bryan argues that Bailey's responses were "equivocal." But here those equivocal responses, taken all together, add up to complete ambiguity. As mentioned above, the trial judge has the right to resolve that ambiguity. *Brown*, 551 U.S. at 8 (alteration in original) (quoting *Darden v. Wainwright*, 477 U.S. 168, 178 (1986)). In this case, the trial judge decided that *I doubt it* meant *I cannot*. That is not clearly erroneous or even erroneous.

Bryan also argues that (a) the judge misstated the law to Bailey when questioning her about her ability to sign a death verdict and (b) this misstatement somehow undermines the finding that she was biased. While explaining the weighing of aggravation and mitigation, the judge told her, "[W]hen the mitigation outweighs the aggravating circumstances, you can go to life in prison, or life in prison with parole at 30 years, or life in prison with parole at 25 years."

Bryan says this is a misstatement of Ohio law, but does not explain further. Bryan also does not explain *how* the misstatement undermines the trial judge's finding that Bailey was biased—likely because it would have no such effect.

Because the state court's adjudication of Bryan's Claims 1 and 3 was neither contrary to clearly established federal law nor factually unreasonable, we affirm the district court's ruling.

II. Claim 5: *Batson*

a. Legal Standard

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), *modified on other grounds by Powers v. Ohio*, 499 U.S. 400 (1991). The trial court's determination whether the prosecutor is using his peremptory challenges for that improper reason involves three steps. "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Step two does not demand an explanation that is "persuasive, or even plausible," so long as it is facially race neutral. *Id.* at 767-68. Although the standard to be met at this point may be low, the prosecutor is limited to the explanation he gives. No matter that the trial court or an appellate court may think of better, more plausible, more constitutionally acceptable reasons for the strike, the only explanation to be analyzed is the explanation the prosecutor in fact gave. *See Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)); *see also Cockrell*, 537 U.S. at 338. If step two is satisfied, "the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Elem*, 514 U.S. at 767. The critical question here is "the persuasiveness of the prosecutor's justification for his peremptory strike," *Cockrell*, 537 U.S. at 338-39 — quite simply, whether the trial court finds the prosecutor's race-neutral explanations credible or pretextual. *See id.* at 339.

In addition to the highly deferential standard AEDPA imposes, *Batson* claims are also subject to highly deferential review. The trial court's decision on the ultimate question of improper discriminatory intent is a finding of fact to be accorded "great deference." *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991) (plurality). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Cockrell*, 537 U.S. at 339; *see also Hernandez*, 500 U.S. at 365 ("[E]valuation of the prosecutor's state of mind based on demeanor

and credibility lies 'peculiarly within a trial judge's province.'") quoting *Witt*, 469 U.S. at 428)). In addition, a *Batson* claim "presents a mixed question of law and fact and 'necessarily focuses on the reasonableness of the decision of the state courts. . . .'" *Braxton*, 561 F.3d at 458 (quoting *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003)). The "question of 'whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact.'" *Lancaster,* 324 F.3d at 429 (quoting *Hernandez,* 500 U.S. at 367). Thus, the deference given to district courts "must be modified in the context of a §2254 petition to give credence to §2254(e)(1)'s requirement that facts found by a state court be presumed correct unless the petitioner rebuts this presumption by clear and convincing evidence." *Braxton*, 561 F.3d at 458 (citing *Lancaster*, 324 F.3d at 429 n.1).

b. Striking Potential Juror Crystal Jones

The Warden argues that the district court erred in granting Bryan relief on this claim that the trial court violated *Batson* by allowing the prosecution to use a peremptory challenge to strike potential juror Crystal Jones.

On direct appeal, the Ohio Supreme Court held the claim meritless. *Bryan*, 804 N.E.2d at 454-56, ¶¶ 105-10, 114 (citing *Batson*). The court held that Bryan "offers no evidence of discriminatory intent." *Id.* at 455, ¶ 110. The district court, on habeas review, held that the Ohio Supreme Court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state courts, 28 U.S.C. § 2254(d)(2), and that the state court's finding that the prosecutor did not violate *Batson* was clear error, 28 U.S.C. § 2254(e)(1).

The parties agree that *Batson*'s step one—establishing a prima facie case—is satisfied because the prosecutor went ahead and offered the step-two race-neutral explanation. *See Hernandez*, 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). In addition, the trial court made a step three ruling by finding no *Batson*

violation, although the ruling was concise.**⁴** Therefore, the Ohio Supreme Court's upholding of the *Batson* step three determination—no purposeful racial discrimination—must be analyzed under the appropriate deferential standard.

The Supreme Court of Ohio found the record fully supports the trial court's finding that the prosecution provided sufficient race-neutral reasons for peremptorily striking Jones. Because of the deference afforded to state court determinations through AEDPA, we agree.

At trial, the prosecution offered three reasons for striking Jones: (1) her general demeanor; (2) her non-verbal response to whether the jury was under an enormous amount of pressure to return a verdict; and (3) her listing *The Ox-Bow Incident* in the juror questionnaire and general concerns about the judicial system's fairness.

Concerning Jones's general demeanor and her non-verbal responses, the prosecution stated that Jones's mannerism seemed "very inconvenienced by the whole process that had been taking place." Furthermore, the prosecution noted that "she had been tired of being herded around" and "was somewhat offended by the nature of the questions." These instinctual judgments are the exact nature of decisions that the *Ayala* court recognized that lawyers must make when making "nuanced" comparisons of prospective jurors. 135 S.Ct. at 2201. Because a "trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes," a federal habeas court is not meant to second-guess the state court's decision. *Id.* Therefore, the "determinations of credibility and demeanor lie particularly within a trial judge's province," and "in the absence of extraordinary circumstances," a federal habeas court should "defer to the trial court." *Id.* Because extraordinary circumstances do not exist in this case, we defer to the state court determination of Jones's demeanor as proper grounds for her being struck as a juror.

As for the last race-neutral justification for striking Jones, the prosecutor noted that Jones listed *The Ox-Bow Incident* in her juror questionnaire as to whether or not an African-American can receive a fair trial, along with expressing other general concerns of the judicial system

---

**⁴**Bryan argues that *Snyder v. Louisiana*, 552 U.S. 472 (2008), requires a specific-credibility finding. Under AEDPA, *Snyder* issued too late to be clearly established precedent. *See Akins v. Easterling*, 648 F.3d 380, 390 (6th Cir. 2011).

fairness.[5] In granting habeas relief, the district court found the prosecution's mistaken recount of *The Ox-Bow Incident* facts as basis for racial discrimination. At the trial, the prosecutor stated that *The Ox-Bow Incident* concerned an African-American who was lynched for a crime that he did not commit. While the story did not depict any African-Americans being lynched, that is irrelevant here. What remains relevant is the fact that Jones listed the story as an answer to whether an African-American can receive a fair trial. It was the response to this race-specific question that *The Ox-Bow Incident* became relevant. Furthermore, neither Jones nor Bryan objected to the prosecutor's misstatement of the facts of *The Ox-Bow Incident.* Therefore, through proper AEDPA deference, the state court was not factually unreasonable when it determined that Jones listing *The Ox-Bow Incident* as an answer to the question concerning African-American judicial fairness is a proper race-neutral reason for striking Jones, and the district court improperly substituted its interpretation of the evidence for the findings of the trial judge. *See Ayala*, 135 S.Ct. at 2201.

Ultimately, the state court's adjudication of Bryan's *Batson* claim was neither contrary to clearly established federal law nor factually unreasonable. Even if the district court believed the state court was wrong in its factual determination, it was not unreasonable and therefore proper deference should have been afforded.[6] *See Murray v. Schriro,* 745 F.3d 984, 1005 (9th Cir. 2014) ("The trial judge has a front-row seat in the orchestra" whereas the federal habeas court sits in a "lofty perch in the loges, where we are separated by time and distance from the proceedings."). Accordingly, we reverse the district court's grant of habeas relief on Bryan's *Batson* claim.

---

[5]In addition to *The Ox-Bow Incident* comment, Jones's questionnaire also provided other concerns with judicial fairness. For example, she stated that she believed race plays a role in the criminal justice system. These concerns provided another proper, race-neutral, basis to strike Jones. *See, e.g., Akins,* 648 F.3d at 388 (holding that a prosecutor does not violate *Batson* by removing a juror who expresses interest about race in the criminal justice system).

[6]The lack of deference can best be seen in the district court's independent review of Jones's response in comparison to white jurors. Ultimately, the district judge used the comparative analysis to "apply de novo review of factual findings and to substitute its own opinion for the determination made on the scene by the trial judge." *Ayala*, 135 S.Ct. at 2202.

III.  Claims 6 and 7: Prosecutorial Misconduct

a.  Legal Standard

Prosecutorial misconduct not touching on a specific provision of the Bill of Rights is reviewed under the general standard for due-process violations.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Under this, "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 477 U.S. at 181 (quoting first *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), then *DeChristoforo*, 416 U.S. at 643).  If the misconduct was harmless, then as a matter of law, there was no due-process violation. *See Greer v. Miller*, 483 U.S. 756, 765 & n.7 (1987).  In federal habeas, the determination is whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

b.  Guilt Phase Closing

Bryan argues that the prosecutor committed misconduct in guilt-phase closing causing the jury to find aggravated murder where the evidence was only sufficient to find involuntary manslaughter.  On direct appeal, the Ohio Supreme Court held that Bryan had forfeited all but plain error. The court found the error not at all plain "in view of the overwhelming evidence of his guilt."  *Bryan*, 804 N.E.2d at 459-60, ¶¶ 141-53.  In federal habeas proceedings, the district court found some of the prosecutor's comments improper, but harmless in view of what the district court agreed was "overwhelming" evidence of guilt.

The Ohio Supreme Court devoted nine paragraphs to giving an adequate sense of the challenged portion of the prosecutor's closing.  *Bryan*, 804 N.E.2d at 459-60, ¶¶ 142-50.  Instead of providing a verbatim recount of those nine paragraphs, here are a few examples of the prosecutor's statements:

[W]hen this case is just a memory to you, ladies and gentleman, Officer Leon's small children will go on a journey of their own to find out what kind of a father they had. And ultimately that journey will take them here to this courtroom.

Ultimately, ladies and gentlemen, their mother, their grandfather, their uncles, their friends, their colleagues will all say something about who Wayne Leon was but ultimately it will be your decision * * * that will define Wayne Leon.

*Id.* at 459-60, ¶¶143-50.

Because Bryan admitted killing Officer Leon, his prejudice argument concerns only his intent when pulling the trigger. Like his argument at trial, Bryan argues that he did not intend to kill the officer. Instead, Bryan argues that he shot Officer Leon through a reflex motion after Officer Leon saw the gun and pivoted.

Bryan's account of the events is implausible. First, it directly contradicts the eyewitness testimony of Geneva Marie Jefferson and George Abou-Nader. Both witnesses testified that Officer Leon did not see the gun causing Bryan's "reflexes" to pull the trigger.

Even disregarding the eyewitness testimony, the physical evidence proves Bryan's argument implausible. The coroner testified that (a) Officer Leon "had a single gunshot wound on the *left* side of his face" and (b) the bullet's trajectory — entering on the left, but coming to rest "immediately beneath the skull on the back of the right side of the head" — was consistent with his face having been turned to the right when he was shot. *See Bryan*, 804 N.E.2d at 447, ¶ 33.

In the end, the jury, presented with an instruction for the lesser offense of involuntary manslaughter, found Bryan guilty of aggravated murder not because of its being inflamed but because of the evidence presented. Additionally, the errors complained of were harmless under *Brecht*.

c. Penalty Phase Closing

Bryan argues that the prosecutor made extensive improper comments in penalty-phase closing argument, thus inflaming the jury. Bryan lost this claim on direct appeal, partly on the merits, mainly (where he did not object at trial) because the error was not plain. *Bryan*,

804 N.E.2d at 463-65, ¶¶ 175-87. He also lost at the district court. The district court reached the merits because it found the Warden to have forfeited his procedural-default defense. However, the district court held the claim meritless because the Ohio Supreme Court decision was reasonable.[7]

The prosecutor's alleged acts of misconduct were many. *See Bryan*, 804 N.E.2d at 463-65, ¶¶ 176-78, 180-86 (outlining them). Some the state supreme court held improper. *Id.* at 464, ¶¶ 180-82. The district court agreed.

Nonetheless, assuming the comments at the worst, any harm was cured when the Ohio Supreme Court independently reweighed aggravation and mitigation. *Bryan*, 804 N.E.2d at 469-71, ¶¶ 215-27; *see also id.* at 464, ¶ 182 ("[O]ur independent assessment of the sentence has cured any lingering impact from the prosecutor's comments"). *See LaMar v. Houk*, 798 F.3d 405, 431 (6th Cir. 2015) (citing *Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006)), *cert. denied*, 136 S. Ct. 1715 (2016); *see also Clemons v. Mississippi*, 494 U.S. 738, 749-50 (1990).[8]

In an attempt to succeed on this issue, Bryan cites two cases: *DePew v. Anderson*, 311 F.3d 742 (6th Cir. 2002), and *Cauthern v. Colson*, 736 F.3d 465 (6th Cir. 2013). However, neither case changes the outcome.

*DePew* issued several years before this court first recognized that, under *Clemons*'s logic, appellate reweighing would cure not just penalty-phase jury-weighing errors, but also prosecutorial misconduct affecting that jury weighing. *See Lundgren*, 440 F.3d at 781-83; *see also id.* at 783 ("This Court has not addressed a case . . . in which the reweighing is said to cure a trial level violation tending to prejudice the jury's view of the evidence, as opposed to the jury's inclusion of an impermissible factor or failure to consider a relevant mitigating factor."). Hence, *DePew* did not consider whether the misconduct found there had been cured by appellate reweighing. *Cauthern*, meanwhile, was tried in Tennessee, 736 F.3d at 468, where appellate

---

[7]While there is a question whether the procedural-default defense can be raised sua sponte, it is unnecessary in this case as the state court's adjudication of the claim was not unreasonable.

[8]Bryan also argues the prosecutor's misconduct in the guilt phase had a carryover effect on the penalty phase. Even if true, that too was cured by appellate reweighing. *See Bryan*, 804 N.E.2d at 471, ¶ 227 ("In evaluating this sentence, we have considered the potential effect on the jury of the prosecutor's improper remarks during his arguments both in the guilt phase and the penalty phase").

courts may not independently reweigh aggravation and mitigation. *See State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993).

Because the state court's adjudication of Bryan's Claims 6 and 7 was neither contrary to clearly established federal law nor factually unreasonable, we affirm the district court's ruling.

### IV.  Claims 8 and 9: Ineffective Assistance of Counsel

#### a.  Legal Standard

To establish ineffective assistance of counsel, Bryan must show that (1) counsel's performance was deficient — objectively unreasonable under prevailing professional norms — and (2) it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Prejudice exists if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 694.  Although the reasonable-probability standard is lower than the more-probable-than-not standard, *id.* at 693-94; *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), the difference between the two "is slight and matters 'only in the rarest case.'  The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 697).

Something else must be borne in mind when the ineffectiveness claim is reviewed under AEDPA. The *Strickland* and § 2254(d) standards are both highly deferential.  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

#### b.  Guilt Phase

Bryan argues that counsel were ineffective in the guilt phase. In district court, he listed several trial-counsel failures.  Here, he argues only one: failure to procure a firearms expert. According to Bryan, the State's expert at trial testified that the handgun had a trigger pull of 10.5 pounds.  But a defense firearms expert could have testified that the trigger pull was only 5.5 pounds.  This would have supported Bryan's involuntary-manslaughter defense.

Both the state court of appeals in post-conviction proceedings, *Bryan*, 2010 WL 1918606, at *6-7 (citing *Strickland*), and the district court held this claim meritless.

In light of both the eyewitness testimony and the physical evidence, Bryan's involuntary-manslaughter defense is not plausible. Subtracting five pounds from the trigger pull would not change the plausibility of his defense.

Bryan has a fallback argument: use of this evidence would have left residual doubt of his guilt to be carried over to the penalty phase. This also fails. Residual doubt is not a mitigator in Ohio. *State v. McGuire*, 686 N.E.2d 1112, 1122-23 (Ohio 1997). For purposes of the *Strickland* prejudice analysis, it must be assumed the jurors would have obeyed the law. 466 U.S. at 694-95. Hence, it must be assumed they would not have considered residual doubt, even if they had had any.

Accordingly, Bryan's claim for ineffective assistance of counsel in the guilt phase fails because he cannot establish prejudice.

c. Penalty Phase

Bryan argues that his counsel were ineffective in the penalty phase due to failing to present more testimony, better preparing his mother to testify, and failing to introduce his prison records.

He twice raised this claim in state court. On direct appeal — where he was forbidden to add evidence to the record, *see State v. Ishmail*, 377 N.E.2d 500, syl. ¶ 1 (Ohio 1978) — the Ohio Supreme Court held that counsel's performance was neither deficient nor prejudicial. *Bryan*, 804 N.E.2d at 465-66, ¶¶ 188-95, 197 (citing *Strickland*). In post-conviction proceedings, the state court of appeals held the claim meritless. *Bryan*, 2010 WL 1918606, at *6-11 (citing *Strickland*); *see also id.* at *11 ("may" also be barred by res judicata). The district court held the claim meritless.

Although "the defense employed a mitigation specialist, a psychologist, and an investigator[,]"*Bryan*, 804 N.E.2d at 465, ¶ 190, Bryan's counsel decided to only put Bryan's mother on the stand, make an unsworn statement, and submit documentary evidence. While

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, *Strickland*, 466 U.S. at 690, the review of counsel's performance is unnecessary here.

Bryan has failed to establish that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceedings would have been different. *Id.* at 694. Bryan killed a police officer, and repeatedly tried to kill another man, all while trying to escape arrest for another committed offense. Thus, it is not reasonably probable that submitting Bryan's broken childhood and mixed prison record would have changed the outcome of the penalty phase.

Accordingly, we affirm the district court's ruling on Claims 8 and 9 because Bryan's counsel satisfied *Strickland*'s deferential standard.

## V. Claim 16: Unconstitutional Death-Penalty Scheme

Bryan argues that Ohio's death-penalty scheme is unconstitutional because it (a) imposes death in a racially discriminatory manner and (b) violates international law. On direct appeal, the Ohio Supreme Court summarily rejected this claim. *Bryan*, 804 N.E.2d at 469, ¶ 214. The district court held that rejection reasonable and the claim, therefore, meritless.

This claim fails. Ohio's death-penalty scheme is neither unconstitutionally racially discriminatory, *see Keene v. Mitchell*, 525 F.3d 461, 463-65 (6th Cir. 2008); *Coleman v. Mitchell*, 268 F.3d 417, 441-42 (6th Cir. 2001), nor barred by international law, *see Buell v. Mitchell*, 274 F.3d 337, 370-76 (6th Cir. 2001); *Coleman*, 268 F.3d at 443 & n.12.

Accordingly, we affirm the district court's ruling concerning Bryan's claim that Ohio's death-penalty scheme was unconstitutional.

## CONCLUSION

The district court correctly denied Bryan's writ of habeas corpus on the grounds of Claim 1 (Juror Bross), 3 (Jurors Hawkins and Bailey), 6 (guilt phase prosecutorial misconduct), 7 (penalty phase prosecutorial misconduct), 8 (penalty phase IAC), 9 (guilt phase IAC), 15 (lethal injection), and 16 (unconstitutional death-penalty scheme). However, the district court

incorrectly granted Bryan's writ of habeas corpus on Claim 5 (*Batson*) by failing to properly defer to the state court's ruling and substituting its own opinion for the determination made by the state court.

For the reasons stated, we **AFFIRM IN PART AND REVERSE IN PART** the judgment of the district court, **VACATE** the grant of a writ of habeas corpus, and **REMAND** the case for dismissal of the § 2254 petition.

—————————

## CONCURRENCE

—————————

ROGERS, Circuit Judge, concurring.  I join the majority opinion in full.

The most difficult aspect of this case is the trial court's striking of veniremember Crystal Jones, who from the record at least appears to have been a perfectly good person to have on the jury.  However, applying AEDPA deference, the state court was not unreasonable in rejecting the *Batson* challenge with respect to Ms. Jones.  Each of the prosecutor's reasons can be seen as providing support for the same valid nonracial prosecutorial concern—that Ms. Jones was steeling herself from being rushed to judgment.  A prosecutor could validly wish to strike a juror with such an attitude.  The sense that Ms. Jones felt inconvenienced, and that she felt "herded around," directly support such a prosecutorial concern.  So does Ms. Jones' answer to questionnaire question 47.  The question was, "Do you believe an African American can receive a fair trial in our Criminal Justice System?"  Ms. Jones answered, "Yes."  Following up on her just-expressed thought, however, she explained, "again if there isn't a system at all then, the general public would take matters in their own hands, i.e., 'The Ox-Bow Incident.'"  The *Ox-Bow Incident* is a well-known novel that involves a Western vigilante hanging of three innocent men.  Independently bringing up the novel could reinforce a prosecutorial perception that Ms. Jones had her mind on the possibility of a rush to judgment.  The district court, for its part, relied on the mistaken assumption of the prosecutor—that the victim(s) in the novel were African-American—to conclude that the prosecutor's reliance on Ms. Jones' reference was racial.  But that mistake as to the novel's story does not logically support a conclusion that the prosecutor was striking Ms. Jones on the basis of race.

---

**DISSENT**

---

BERNICE BOUIE DONALD, Circuit Judge, dissenting in part.  Because I believe that the district court properly found the Ohio Supreme Court decision to be an unreasonable determination of the facts surrounding Bryan's *Batson* challenge, I respectfully dissent from part II of the majority opinion.

I.

"The very foundation upon which *Batson* rests is the unquestioned premise that while 'a defendant has no right to a petit jury composed in whole or in part of persons of his own race, the defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" *Lancaster v. Adams*, 324 F.3d 423, 434 (6th Cir. 2003) (alterations removed) (quoting *Batson v. Kentucky*, 476 U.S. 79, 85–86 (1986)).  I agree with the majority that AEDPA's deferential standards govern our review of Bryan's *Batson* challenge.  But I disagree that we are constrained to find that Bryan is not entitled to relief, as the majority has chosen to do.  Regarding the duty of federal courts, the Supreme Court has been clear: "[D]eference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Under AEDPA, Bryan is entitled to relief if he can show that the Ohio Supreme Court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In its review of Bryan's *Batson* claim, the Ohio Supreme Court concluded that "Bryan offer[ed] no evidence of discriminatory intent." *State v. Bryan*, 804 N.E.2d 433, 455 (Ohio 2004).  Based on the ample evidence of a race-based motive contained in the record, however, I believe that the Ohio Supreme Court's decision was unreasonable.

II.

The prosecution listed five reasons for striking potential juror Crystal Jones: (1) Jones' demeanor and mannerisms indicated she was inconvenienced by jury duty; (2) Jones' yes-or-no answers to *voir dire* questions indicated that she was offended by the prosecutor's questions; (3) in her jury questionnaire, Jones failed to directly answer whether she believed that the criminal justice system was fair; (4) during *voir dire*, Jones explained her concerns regarding fairness in the criminal justice system by referring to *The Ox-Bow Incident* (which, in giving a purportedly race-neutral explanation for striking Jones, the prosecutor incorrectly described as a book and film in which an African-American was wrongfully accused of a crime and lynched); and (5) in response to the prosecutor's question about whether the veniremembers felt community pressure to convict Bryan, Jones nodded her head affirmatively to indicate that she felt pressure. *Bryan v. Bobby*, 114 F. Supp. 3d 467, 502–04 (N.D. Ohio 2015).

Initially, two of the purportedly race-neutral reasons the prosecutor gave for striking Jones apply equally to white veniremembers who ultimately sat on the jury. First, the prosecutor argued that Jones gave primarily yes-or-no answers, which indicated that she felt inconvenienced and offended by the jury selection process. However, as the district court noted, there is ample evidence that both Jones and other white veniremembers alike gave yes-or-no answers when appropriate, and detailed responses when appropriate. *Bryan*, 114 F. Supp. 3d at 509–11. Second, the prosecutor claimed that he struck Jones because she failed to directly answer whether she believed the criminal justice system to be fair. Notwithstanding the fact that the prosecutor never asked Jones this question directly, two white veniremembers expressed similar opinions, and one white veniremember specifically stated that she thinks the justice system fails to be fair sometimes. The prosecutor, however, did not take offense to that belief until it came from Jones, an African-American veniremember. Evidence of this nature favors a finding that a prosecutor's reasons were, in fact, pretexual: "If a prosecutor's proffered reason for striking a black panelist applies just as well to a white panelist allowed to serve, that is evidence tending to prove purposeful discrimination." *Miller-El*, 545 U.S. at 232.

The prosecutor's next proffered race-neutral reasoning concerned Jones' response to a jury questionnaire which asked whether she believed "an African-American can receive a fair

trial in our Criminal Justice System." *Bryan*, 114 F. Supp. 3d at 501. Jones wrote that systems are necessary to prevent the public from taking matters into their own hands, and cited *The Ox-Bow Incident*. *Id*. During *voir dire*, Jones agreed with the prosecutor's description of *The Ox-Bow Incident* as a book and movie about a lynch mob rushing to judgment and hanging the wrong man. Nowhere, however, in this retelling did the prosecutor describe the lynched, innocent man as African-American. It was not until pressed to give a race-neutral reason for striking Jones that the prosecutor injected race into Jones' answer, where it did not previously exist. Even accepting the prosecutor's unilateral belief that Jones' reference to *The Ox-Bow Incident* indicated her concern about racial justice, it does not sufficiently show a lack of discriminatory intent. Three white veniremembers also expressed concern with racial justice and were not stricken. In my view, the only logical reason that the prosecutor struck Jones, and not the other three white veniremembers, is because Jones, like Bryan, is African-American, and the prosecutor feared that this commonality would make Jones more likely to vote in Bryan's favor. *See Miller-El*, 545 U.S. at 232.

Finally, the last explanation the prosecutor provides for striking Jones is that she responded with an affirmative gesture when defense counsel stated: "I think we all kind of agree that there's a lot of pressure on a jury to convict." *Bryan*, 114 F. Supp. 3d at 512. Not surprisingly, this reason is in direct conflict with the prosecutor's reasoning regarding Jones' reference to *The Ox-Bow Incident*. Presumably, the prosecutor's concern with Jones' response here is that she is biased in favor of the state—i.e., *pressured to convict*—but also, if we take into consideration the prosecutor's concern with her reference to *The Ox-Bow Incident*, biased in favor of the defense. To allow both of these reasons to support a reasonable determination of the facts, in my mind, is illogical.[1]

---

[1]I note that the prosecutor also offered, as a race-neutral reason, that Jones' mannerisms and demeanor indicated that she was inconvenienced by the jury duty process. However, even agreeing with the majority that the "trial court is best situated to evaluate both the words and demeanor of jurors who are peremptorily challenged," Majority Op. *ante* at 14 (quoting *Davis v. Ayala*, 135 S. Ct. 2187, 2201 (2015)), I find it difficult to accept the Ohio Supreme Court's finding as reasonable. Particularly, as the district court found, because the trial court failed to engage in any on-the-record analysis of Jones' demeanor. To me, the state supreme court's decision was an unsupported presumption that Jones' demeanor was a valid reason to strike her.

III.

"*Batson* recognized that it is fundamentally unfair to permit racial considerations to drive the use of peremptory challenges against jurors. When the prosecution strikes every potential black [] juror, a reviewing court has a responsibility to ensure that the trial court's denial of the defendant's *Batson* motion was not influenced by constitutional error." *Davis v. Ayala*, 135 S. Ct. 2187, 2218 (2015) (Sotomayor, J., dissenting). To view facts such as those presented in this case as objectively reasonable, even within the constraints of AEDPA, abdicates our duty and renders *Batson* superfluous.

The judgment of the district court granting Bryan habeas relief on his *Batson* claim should be affirmed. I dissent as to part II of the opinion.